# COLTEN $v.$ KENTUCKY

No. 71–404. Argued April 17, 1972—Decided June 12, 1972

WHITE, J., delivered the opinion of the Court, in which BURGER, C. J., and BRENNAN, STEWART, BLACKMUN, POWELL, and REHN- QUIST, JJ., joined. DOUGLAS, J., *post*, p. 120, and MARSHALL, J., *post*, p. 122, filed dissenting opinions.

*Alvin L. Goldman* ~~argued~~ the cause for appellant. With him on the brief were *Melvin L. Wulf* and *Sanford Jay Rosen.*

*Robert W. Willmott, Jr.,* Assistant Attorney General of Kentucky, argued the cause for appellee *pro hac vice.* With him on the brief was *Ed W. Hancock,* Attorney General.

MR. JUSTICE WHITE delivered the opinion of the Court.

This case presents two unrelated questions. Appellant challenges his Kentucky conviction for disorderly conduct on the ground that the conviction and the State's statute are repugnant to the First and Fourteenth Amendments. He also challenges the constitutionality of the enhanced penalty he received under Kentucky's two-tier system for adjudicating certain criminal cases, whereby a person charged with a misdemeanor may be tried first in an inferior court and, if dissatisfied with the outcome, may have a trial *de novo* in a court of general

criminal jurisdiction but must run the risk, if convicted, of receiving a greater punishment.

Appellant Colten and 15 to 20 other college students gathered at the Blue Grass Airport outside Lexington, Kentucky, to show their support for a state gubernatorial candidate and to demonstrate their lack of regard for Mrs. Richard Nixon, then about to leave Lexington from the airport after a public appearance in the city. When the demonstration had ended, the students got into their automobiles and formed a procession of six to 10 cars along the airport access road to the main highway. A state policeman, observing that one of the first cars in the entourage carried an expired Louisiana license plate, directed the driver, one Mendez, to pull off the road. He complied. Appellant Colten, followed by other motorists in the procession, also pulled off the highway, and Colten approached the officer to find out what was the matter. The policeman explained that the Mendez car bore an expired plate and that a traffic summons would be issued. Colten made some effort to enter into a conversation about the summons. His theory was that Mendez may have received an extension of time in which to obtain new plates. In order to avoid Colten and to complete the issuance of the summons, the policeman took Mendez to the patrol car. Meanwhile, other students had left their cars and additional policemen, having completed their duties at the airport and having noticed the roadside scene, stopped their cars in the traffic lane abreast of the students' vehicles. At least one officer took responsibility for directing traffic, although testimony differed as to the need for doing so. Testimony also differed as to the number of policemen and students present, how many students left their cars and how many were at one time or another standing in the roadway. A state police captain asked on four or five occasions that the group disperse. At least five times

police asked Colten to leave.[1] A state trooper made two requests, remarking at least once: "Now, this is none of your affair . . . get back in your car and please move on and clear the road." In response to at least one of these requests Colten replied that he wished to make a transportation arrangement for his friend Mendez and the occupants of the Mendez car, which he understood was to be towed away. Another officer asked three times that Colten depart and when Colten failed to move away he was arrested for violating Kentucky's disorderly conduct statute, Ky. Rev. Stat. § 437.016 (Supp. 1968). The arresting officer testified that Colten's response to the order had been to say that he intended to stay and see what might happen. Colten disputed this. He testified that he expressed a willingness to leave but wanted first to make a transportation arrangement. At trial he added that he feared violence on the part of the police.[2]

The complaint and warrant charging disorderly conduct, which carries a maximum penalty of six months in jail and a fine of $500, were addressed to the Quarterly

---

[1] This version of the facts is taken largely from the opinion of the Kentucky Court of Appeals. *Colten* v. *Commonwealth,* 467 S. W. 2d 374, 375–376 (Ky. 1971). Colten testified that only the arresting officer ordered him to leave and that the three orders were uttered in such rapid succession that he had little opportunity to comply. App. 49–51. This was disputed by a policeman who testified that earlier he twice asked appellant to leave and gave the admonition quoted in the text. *Id.,* at 23–24. Our own examination of the record indicates that the Kentucky courts' resolution of this factual dispute was a fair one. Cf. *Cox* v. *Louisiana,* 379 U. S. 536, 545 n, 8 (1965).

[2] In his brief appellant makes a passing reference to the possibility of violence on the part of police and suggests that he remained on the scene to avert misdeeds or to be a potential witness to them. Yet he builds no factual basis for a reasonable apprehension of violence and seemingly dispels whatever force such a contention might have when he states in his brief: "In the overwhelming majority of cases, that suspicion [of police brutality] is undoubtedly wrong, but it is there." Brief for Appellant 36.

Court of Fayette County, where Colten was tried, convicted, and fined $10. Exercising his right to a trial *de novo* in a court of general jurisdiction, Colten "appealed," as the Kentucky rules style this recourse, Ky. Rule Crim. Proc. 12.02, to the Criminal Division of the Fayette Circuit Court. By consent, trial was to the court and Colten was convicted of disorderly conduct and this time fined $50. The Kentucky Court of Appeals affirmed. *Colten* v. *Commonwealth,* 467 S. W. 2d 374 (1971). It rejected Colten's constitutional challenges to the statute and his claim that the punishment imposed was impermissible, under *North Carolina* v. *Pearce,* 395 U. S. 711 (1969). We noted probable jurisdiction. 404 U. S. 1014 (1972).

I

Colten was convicted of violating Ky. Rev. Stat. § 437.016 (1)(f) (Supp. 1968), which states:

> "(1) A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
> . . . . .
>
> "(f) Congregates with other persons in a public place and refuses to comply with a lawful order of the police to disperse . . . ."

The Kentucky Court of Appeals interpreted the statute in the following way:

> "As reasonably construed, the statute does not prohibit the lawful exercise of any constitutional right. We think that the plain meaning of the statute, in requiring that the proscribed conduct be done 'with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof,' is that the specified intent must be the *predominant* intent. Predominance can be determined either (1) from the fact that no bona fide intent to exercise a constitu-

tional right appears to have existed or (2) from the fact that the interest to be advanced by the particular exercise of a constitutional right is insignificant in comparison with the inconvenience, annoyance or alarm caused by the exercise." 467 S. W. 2d, at 377.

The evidence warranted a finding, the Kentucky court concluded, that at the time of his arrest, "Colten was not undertaking to exercise any constitutionally protected freedom." Rather, he "appears to have had no purpose other than to cause inconvenience and annoyance. So the statute as applied here did not chill or stifle the exercise of any constitutional right." Id., at 378.

Based on our own examination of the record, we perceive no justification for setting aside the conclusion of the state court that when arrested appellant was not engaged in activity protected by the First Amendment. Colten insists that in seeking to arrange transportation for Mendez and in observing the issuance of a traffic citation he was disseminating and receiving information. But this is a strained, near-frivolous contention and we have little doubt that Colten's conduct in refusing to move on after being directed to do so was not, without more, protected by the First Amendment. Nor can we believe that Colten, although he was not trespassing or disobeying any traffic regulation himself, could not be required to move on. He had no constitutional right to observe the issuance of a traffic ticket or to engage the issuing officer in conversation at that time. The State has a legitimate interest in enforcing its traffic laws and its officers were entitled to enforce them free from possible interference or interruption from bystanders, even those claiming a third-party interest in the transaction. Here the police had cause for apprehension that a roadside strip, crowded with persons and automobiles, might expose the entourage, passing motorists, and police to the risk of accident. We cannot disagree with the finding

below that the order to disperse was suited to the occasion. We thus see nothing unconstitutional in the manner in which the statute was applied.

## II

Neither are we convinced that the statute is either impermissibly vague or broad. We perceive no violation of "[t]he underlying principle ... that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *United States* v. *Harriss*, 347 U. S. 612, 617 (1954); cf. *Connally* v. *General Construction Co.*, 269 U. S. 385, 391 (1926). Here the statute authorized conviction for refusing to disperse with the intent of causing inconvenience, annoyance, or alarm. Any person who stands in a group of persons along a highway where the police are investigating a traffic violation and seeks to engage the attention of an officer issuing a summons should understand that he could be convicted under subdivision (f) of Kentucky's statute if he fails to obey an order to move on. The root of the vagueness doctrine is a rough idea of fairness. It is not a principle designed to convert into a constitutional dilemma the practical difficulties in drawing criminal statutes both general enough to take into account a variety of human conduct and sufficiently specific to provide fair warning that certain kinds of conduct are prohibited. We agree with the Kentucky court when it said: "We believe that citizens who desire to obey the statute will have no difficulty in understanding it . . . ." *Colten* v. *Commonwealth*, 467 S. W. 2d, at 378.

Colten also argues that the Kentucky statute is overbroad. He relies on *Cox* v. *Louisiana*, 379 U. S. 536 (1965), where the Court held unconstitutional a breach-of-peace statute construed to forbid causing agitation or

disquiet coupled with refusing to move on when ordered to do so. The Court invalidated the statute on the ground that it permitted conviction where the mere expression of unpopular views prompted the order that is disobeyed. Colten argues that the Kentucky statute must be stricken down for the same reason.

As the Kentucky statute was construed by the state court, however, a crime is committed only where there is no bona fide intention to exercise a constitutional right—in which event, by definition, the statute infringes no protected speech or conduct—or where the interest so clearly outweighs the collective interest sought to be asserted that the latter must be deemed insubstantial. The court hypothesized, for example, that one could be convicted for disorderly conduct if at a symphony concert he arose and began lecturing to the audience on leghorn chickens. 467 S. W. 2d, at 377. In so confining the reach of its statute, the Kentucky court avoided the shortcomings of the statute invalidated in the *Cox* case. Individuals may not be convicted under the Kentucky statute merely for expressing unpopular or annoying ideas. The statute comes into operation only when the individual's interest in expression, judged in the light of all relevant factors, is "minuscule" compared to a particular public interest in preventing that expression or conduct at that time and place. As we understand this case, appellant's own conduct was not immune under the First Amendment and neither is his conviction vulnerable on the ground that the statute threatens constitutionally protected conduct of others.[3]

---

[3] Appellant attacks on overbreadth grounds other subsections of the disorderly conduct statute, such as those that prohibit the making of an "unreasonable noise" and the use of "abusive or obscene language." Ky. Rev. Stat. §§ 437.016 (b), (c) (Supp. 1968). But Colten was not convicted of violating these subsections and they are not properly before us in this case.

## III

Kentucky, like many other States,[4] has a two-tier system for adjudicating less serious criminal cases. In Kentucky, at the option of the arresting officer, those crimes classified under state law as misdemeanors[5] may be charged and tried in a so-called inferior court,[6] where, as in the normal trial setting, a defendant may choose to have a trial or to plead guilty. If convicted after trial or on a guilty plea, however, he has a right to a trial *de novo* in a court of general criminal jurisdiction, *Brown* v. *Hoblitzell*, 307 S. W. 2d 739 (Ky. 1957), so

---

[4] *E. g.*, Ariz. Rev. Stat. Ann. § 22–371 *et seq.* (1956 and Supp. 1971–1972); Ark. Stat. Ann. § 44–501 *et seq.* (1964); Colo. Rule Crim. Proc. 37 (f); Fla. Stat. Ann. § 924.41 *et seq.* (Supp. 1972–1973); Ind. Ann. Stat. § 9–713 *et seq.* (1956 and Supp. 1971); Kan. Stat. Ann. § 22–3610 *et seq.* (Supp. 1971); Me. Dist. Ct. Crim. Rule 37 *et seq.;* Md. Ann. Code, Art. 5, § 43 (1968); Mich. Stat. Ann. § 28.1226· (Supp. 1972); Minn. Stat. §§ 488.20, 633.20 *et seq.* (1969); Miss. Code Ann. §§ 1201, 1202 (Supp. 1971); Mo. Sup. Ct. Rule 22; Mont. Rev. Codes Ann. § 95–2001 *et seq.* (1947); Neb. Rev. Stat. § 29–601 *et seq.* (1964); Nev. Rev. Stat. § 189.010 *et seq.* (1969); N. H. Rev. Stat. Ann. §§ 502:18, 502–A:11–12 (1968); N. M. Stat. Ann. § 36–15–1 *et seq.* (Supp. 1971); N. C. Gen. Stat. §§ 15–177 *et seq.*, 20–138 (1965 and Supp. 1971); N. D. Cent. Code § 33–12–40 *et seq.* (1960); Pa. Stat. Ann., Tit. 42, § 3001 *et seq.* (Supp. 1972–1973); Pa. Const., Sched. Art. 5, § 16 (r)(iii) (Philadelphia); Tex. Code Crim. Proc., Arts. 44.17, 45.10 (1966); Va. Code Ann. § 16.1–129 *et seq.* (1950); Wash. Rev. Code § 3.50.380 *et seq.* (Supp. 1971); W. Va. Code Ann. § 50–18–1 *et seq.* (1966 and Supp. 1971).

[5] Misdemeanors are defined as those crimes punishable by a maximum of one year in jail and a $500 fine. Ky. Rev. Stat. §§ 25.010, 26.010 (1962 and Supp. 1968).

[6] What the Kentucky Court of Appeals calls inferior courts include county, quarterly, justice's and police courts. In all cases in which the punishment is limited to a fine of $20, the inferior courts have original jurisdiction. Ky. Rev. Stat. § 25.010 (1962). In all other misdemeanor cases their jurisdiction is concurrent with that of the circuit courts.

long as he applies within the statutory time.[7] The right to a new trial is absolute. A defendant need not allege error in the inferior court proceeding. If he seeks a new trial, the Kentucky statutory scheme contemplates that the slate be wiped clean. Ky. Rule Crim. Proc. 12.06. Prosecution and defense begin anew. By the same token neither the judge nor jury that determines guilt or fixes a penalty in the trial *de novo* is in any way bound by the inferior court's findings or judgment. The case is to be regarded exactly as if it had been brought there in the first instance. A convicted defendant may seek review in the state appellate courts in the same manner as a person tried initially in the general criminal court. Ky. Rev. Stat. § 23.032.(Supp. 1968). However, a defendant convicted after a trial or plea in an inferior court may not seek ordinary appellate review of the inferior court's ruling. His recourse is the trial *de novo*.

While by definition two-tier systems throughout the States have in common the trial *de novo* feature,[8] there are differences in the kind of trial available in the inferior courts of first instance, whether known as county, municipal, police, or justice of the peace courts, or are otherwise referred to. Depending upon the jurisdiction and offense charged, many such systems provide as complete protection for a criminal defendant's constitutional rights as do courts empowered to try more serious crimes. Others, however, lack some of the safeguards provided in more serious criminal cases. Although appellant here was entitled to a six-man jury, cf. *Williams v. Florida,* 399 U. S. 78 (1970), which he waived, some

---

[7] Ky. Rev. Stat. § 23.032 (Supp. 1968). Kentucky denominates an application for a trial *de novo* an "appeal." However, the right to a new trial is unconditional and exists even when a defendant seeks redetermination of questions of law. Ky. Rules Crim. Proc. 12.02, 12.06.

[8] A general discussion of how these courts operate may be found in 47 Am. Jur. 2d, Justices of the Peace §§ 49–120.

114

States do not provide for trial by jury,[9] even in instances where the authorized punishment would entitle the accused to such tribunal. Cf. *Duncan* v. *Louisiana,* 391 U. S. 145 (1968). Some, including Kentucky, do not record proceedings [10] and the judges may not be trained for their positions either by experience or schooling.[11]

Two justifications are asserted for such tribunals: first, in this day of increasing burdens on state judiciaries, these courts are designed, in the interest of both the defendant and the State, to provide speedier and less costly adjudications than may be possible in the criminal courts of general jurisdiction where the full range of constitutional guarantees is available; second, if the defendant is not satisfied with the results of his first trial he has the unconditional right to a new trial in a superior court, unprejudiced by the proceedings or the outcome in the inferior courts. Colten, however, considers the Kentucky system to be infirm because the judge in a trial *de novo* is empowered to sentence anew and is not bound to stay within the limits of the sentence imposed by the inferior court. He bases his attack both on the Due Process Clause, as interpreted in *North Carolina* v. *Pearce,* 395 U. S. 711 (1969), and on the Fifth Amendment's Double Jeopardy Clause. The

---

[9] E. g., Massachusetts, North Carolina, Pennsylvania. *Mann* v. *Commonwealth,* — Mass. —, 271 N. E. 2d 331 (1971); *State* v. *Spencer,* 276 N. C. 535, 173 S. E. 2d 765 (1970); Pa. Stat. Ann., Tit. 42, § 3001 *et seq.* (Supp. 1972–1973); Pa. Const., Sched. Art. 5, § 16 (r)(iii) (Philadelphia).

[10] E. g., North Carolina, Virginia. *State* v. *Sparrow,* 276 N. C. 499, 173 S. E. 2d 897 (1970); *Evans* v. *City of Richmond,* 210 Va. 403, 171 S. E. 2d 247 (1969).

[11] See, e. g., *People* v. *Olary,* 382 Mich. 559, 170 N. W. 2d 842 (1969); *State* v. *DeBonis,* 58 N. J. 182; 276 A. 2d 137 (1971). However, the trial judge in the Fayette Quarterly Court, where Colten was tried, is a professional.

issues appellant raises have produced a division among the state courts that have considered them [12] as well as a conflict among the federal circuits.[13]

Colten rightly reads *Pearce* to forbid, following a successful appeal and reconviction, the imposition of a greater punishment than was imposed after the first trial, absent specified findings that have not been made here. He insists that the *Pearce* rule is applicable here and that there is no relevant difference between the *Pearce* model and the Kentucky two-tier trial *de novo* system. Both, he asserts, involve reconviction and resentencing, both provide the convicted defendant with the right to "appeal" and in both—even though under the Kentucky scheme the "appeal" is in reality a trial *de novo*—a penalty for the same crime is fixed twice, with the same potential for an increased penalty upon a successful "appeal."

[12] *North Carolina* v. *Pearce*, 395 U. S. 711 (1969), applies: *Bronstein* v. *Superior Court*, 106 Ariz. 251, 475 P. 2d 235 (1970); *State* v. *Shak*, 51 Haw. 626, 466 P. 2d 420 (1970); *Eldridge* v. *State*, 256 Ind. 113, 267 N. E. 2d 48 (1971); *Cherry* v. *State*, 9 Md. App. 416, 264 A. 2d 887 (1970); *Commonwealth* v. *Harper*, 219 Pa. Super. 100, 280 A. 2d 637 (1971).

*Contra: Mann* v. *Commonwealth*, —— Mass. ——, 271 N. E. 2d 331 (1971); *People* v. *Olary*, 382 Mich. 559, 170 N. W. 2d 842 (1969); *State* v. *Stanosheck*, 186 Neb. 17, 180 N. W. 2d 226 (1970); *State* v. *Sparrow*, 276 N. C. 499, 173 S. E. 2d 897 (1970); *Evans* v. *City of Richmond*, 210 Va. 403, 171 S. E. 2d 247 (1969).

New Mexico prohibits enhanced sentencing altogether. N. M. Stat. Ann. § 36–15–3 (Supp. 1971).

[13] *Pearce* applies: *Rice* v. *North Carolina*, 434 F. 2d 297 (CA4 1970), vacated and remanded on ground of possible mootness, 404 U. S. 244 (1971); *contra: Lemieux* v. *Robbins*, 414 F. 2d 353 (CA1 1969), cert. denied, 397 U. S. 1017 (1970). See also *Manns* v. *Allman*, 324 F. Supp. 1149 (WD Va. 1971), holding that *Pearce* does not apply where an enhanced penalty is imposed by a jury rather than a judge.

But *Pearce* did not turn simply on the fact of conviction, appeal, reversal, reconviction, and a greater sentence. The court was there concerned with two defendants who, after their convictions had been set aside on appeal, were reconvicted for the same offenses and sentenced to longer prison terms. In one case the term was increased from 10 to 25 years. Positing that a more severe penalty after reconviction would violate due process of law if imposed as purposeful punishment for having successfully appealed, the court concluded that such untoward sentences occurred with sufficient frequency to warrant the imposition of a prophylactic rule to ensure "that vindictiveness against a defendant for having successfully attacked his first conviction . . . [would] play no part in the sentence he receives after a new trial . . ." and to ensure that the apprehension of such vindictiveness does not "deter a defendant's exercise of the right to appeal or collaterally attack his first conviction . . . ." 395 U. S., at 725.

Our view of the Kentucky two-tier system of administering criminal justice, however, does not lead us to believe, and there is nothing in the record or presented in the briefs to show, that the hazard of being penalized for seeking a new trial, which underlay the holding of *Pearce,* also inheres in the *de novo* trial arrangement. Nor are we convinced that defendants convicted in Kentucky's inferior courts would be deterred from seeking a second trial out of fear of judicial vindictiveness. The possibility of vindictiveness, found to exist in *Pearce,* is not inherent in the Kentucky two-tier system.

We note first the obvious: that the court which conducted Colten's trial and imposed the final sentence was not the court with whose work Colten was sufficiently dissatisfied to seek a different result on appeal; and it

is not the court that is asked to do over what it thought it had already done correctly. Nor is the *de novo* court even asked to find error in another court's work. Rather, the Kentucky court in which Colten had the unrestricted right to have a new trial was merely asked to accord the same trial, under the same rules and procedures, available to defendants whose cases are begun in that court in the first instance. It would also appear that, however understandably a court of general jurisdiction might feel that the defendant who has had a due process trial ought to be satisfied with it, the *de novo* court in the two-tier system is much more likely to reflect the attitude of the Kentucky Court of Appeals in this case when it stated that "the inferior courts are not designed or equipped to conduct error-free trials, or to insure full recognition of constitutional freedoms. They are courts of convenience, to provide speedy and inexpensive means of disposition of charges of minor offenses." *Colten* v. *Commonwealth*, 467 S. W. 2d, at 379. We see no reason, and none is offered, to assume that the *de novo* court will deal any more strictly with those who insist on a trial in the superior court after conviction in the Quarterly Court than it would with those defendants whose cases are filed originally in the superior court and who choose to put the State to its proof in a trial subject to constitutional guarantees.

It may often be that the superior court will impose a punishment more severe than that received from the inferior court. But it no more follows that such a sentence is a vindictive penalty for seeking a superior court trial than that the inferior court imposed a lenient penalty. The trial *de novo* represents a completely fresh determination of guilt or innocence. It is not an appeal on the record. As far as we know, the record from the lower court is not before the superior court and is irrelevant

to its proceedings. In all likelihood, the trial *de novo* court is not even informed of the sentence imposed in the inferior court and can hardly be said to have "enhanced" the sentence.[14] In Kentucky, disorderly conduct is punishable by six months in jail and a fine of $500. The inferior court fined Colten $10, the trial *de novo* court $50. We have no basis for concluding that the latter court did anything other than invoke the normal processes of a criminal trial and then sentence in accordance with the normal standards applied in that court to cases tried there in the first instance. We cannot conclude, on the basis of the present record or our understanding, that the prophylactic rule announced in *Pearce* is appropriate in the context of the system by which Kentucky administers criminal justice in the less serious criminal cases.

It is suggested, however, that the sentencing strictures imposed by *Pearce* are essential in order to minimize an asserted unfairness to criminal defendants who must endure a trial in an inferior court with less-than-adequate protections in order to secure a trial comporting completely with constitutional guarantees. We are not persuaded, however, that the Kentucky arrangement for dealing with the less serious offenses disadvantages defendants any more or any less than trials conducted in a court of general jurisdiction in the first instance, as long as the latter are always available. Proceedings in the inferior courts are simple and speedy, and, if the results in Colten's case are any evidence, the penalty is not characteristically severe. Such proceedings offer a defendant the opportunity to learn about the prosecution's case and, if he chooses, he need not reveal his own. He may

---

[14] In Colten's case the superior court judge did know about the $10 fine. Colten's counsel in closing argument stated what the penalty had been, App. 93, although clearly he need not have done so.

also plead guilty without a trial and promptly secure a *de novo* trial in a court of general criminal jurisdiction. He cannot, and will not, face the realistic threat of a prison sentence in the inferior court without having the help of counsel, whose advice will also be available in determining whether to seek a new trial, with the slate wiped clean, or to accept the penalty imposed by the inferior court. The State has no such options. Should it not prevail in the lower court, the case is terminated, whereas the defendant has the choice of beginning anew. In reality his choices are to accept the decision of the judge and the sentence imposed in the inferior court or to reject what in effect is no more than an offer in settlement of his case and seek the judgment of judge or jury in the superior court, with sentence to be determined by the full record made in that court. We cannot say that the Kentucky trial *de novo* system, as such, is unconstitutional or that it presents hazards warranting the restraints called for in *North Carolina* v. *Pearce,* particularly since such restraints might, to the detriment of both defendant and State, diminish the likelihood that inferior courts would impose lenient sentences whose effect would be to limit the discretion of a superior court judge or jury if the defendant is retried and found guilty.

Colten's alternative contention is that the Double Jeopardy Clause prohibits the imposition of an enhanced penalty upon reconviction. The *Pearce* Court rejected the same contention in the context of that case, 395 U. S., at 719–720. Colten urges that his claim is stronger because the Kentucky system forces a defendant to expose himself to jeopardy as a price for securing a trial that comports with the Constitution. That was, of course, the situation in *Pearce,* where reversal of the first conviction was for constitutional error. The contention also ignores that a defendant can bypass the inferior court simply by pleading guilty and erasing immediately

thereafter any consequence that would otherwise follow from tendering the plea.

The judgment of the Kentucky Court of Appeals is

*Affirmed.*

MR. JUSTICE DOUGLAS, dissenting.

This case arose in the aftermath of a visit of the President's wife to Lexington, Kentucky, where nothing untoward happened. After her plane had left, appellant and a group of his friends got into "some six to ten cars" and started down the access road leading from the airport to the main highway. The lead car was stopped by the police because of an expired license plate and at the officer's request, pulled onto the shoulder of the access road. Appellant, who followed, also pulled onto the shoulder as did the other cars in the group. So there were no cars belonging to appellant's group blocking traffic.

The people in the cars, however, walked around, some talking with the police, and appellant talking mostly with the driver of the lead car. Appellant claimed that he only wanted to advise the man who was getting the citation of his rights, and to help arrange for the driver and passengers in the lead car to get to Lexington. The Court of Appeals of Kentucky, however, said that "Colten's real intent was simply to aggravate, harass, annoy and inconvenience the police, for no purpose other than the pleasure of aggravation, harassment, annoyance and inconvenience." 467 S. W. 2d 374, 376.

The statute under which petitioner was convicted read in relevant part as follows: [1]

> "(1) A person is guilty of disorderly conduct if, with intent to cause public inconvenience, annoyance or alarm, or recklessly creating a risk thereof, he:
>
> . . . . .
>
> "(f) Congregates with other persons in a public

[1] Ky. Rev. Stat. § 437.016 (Supp. 1968).

place and refuses to comply with a lawful order of the police to disperse . . . ."

The Court of Appeals sustained the statute as applied because the inconvenience [2] and annoyance to the police far outweighed appellant's speech which fell "far below the level of minimum social value." 467 S. W. 2d, at 377. That court, citing our obscenity cases, said if "the lack of redeeming social value is a basis upon which the right of freedom of speech may be required to yield to the protection of contemporary standards of morality . . . it would seem that the public's interest in being protected from inconvenience, annoyance or alarm should prevail over any claimed right to utter speech that has no social value." *Ibid.*

But the speech involved here was nonerotic, having no suggestion or flavor of the pornographic.

The speech here was quiet, not boisterous, and it was devoid of "fighting words."

Moreover, this was not a case where speech had moved into action, involving overt acts. There were no fisticuffs, no disorderly conduct in the normal meaning of the words.

The Court of Appeals said "Colten was not seeking to express a thought to any listener or to disseminate any idea." 467 S. W. 2d, at 378. Nor was he, it said, "exercising the right of peaceable assembly." *Ibid.*

He was, however, speaking to a representative of government, the police. And it is to government that one goes "for a redress of grievances," to use an almost forgotten phrase of the First Amendment. But it is said that the purpose was "to cause inconvenience and an-

---

[2] Neither appellant nor any in his group blocked traffic, their cars being parked on the shoulder of the road. Any blocking of traffic was caused by police who pulled up to see what was going on, leaving their patrol cars in the access road. See 467 S. W. 2d 374, 376.

noyance." Since when have we Americans been expected to bow submissively to authority and speak with awe and reverence to those who represent us? The constitutional theory is that we the people are the sovereigns, the state and federal officials only our agents. We who have the final word can speak softly or angrily. We can seek to challenge and annoy, as we need not stay docile and quiet. The situation might have indicated that Colten's techniques were ill-suited to the mission he was on, that diplomacy would have been more effective. But at the constitutional level speech need not be a sedative; it can be disruptive. As we said in *Terminiello* v. *Chicago*, 337 U. S. 1, 4:

> "[A] function of free speech under our system of government is to invite dispute. It may indeed best serve its high purpose when it induces a condition of unrest, creates dissatisfaction with conditions as they are, or even stirs people to anger. Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea."

Under that test this conviction should be set aside.

MR. JUSTICE MARSHALL, dissenting.

In my view, *North Carolina* v. *Pearce*, 395 U. S. 711 (1969), requires a reversal of this case.

In this case the Court correctly evaluates Kentucky's procedure: "[A] defendant convicted after a trial or plea in an inferior court may not seek ordinary appellate review of the inferior court's ruling. His recourse is the trial *de novo*." From this the conclusion is reached that the "trial *de novo*" is not an appeal. What, then, is it?

The pertinent Kentucky Rules provide:

12.02. *Manner of Taking.*

"(1) An appeal to the circuit court is taken by filing with the clerk thereof a certified copy of the judgment and the amount of costs, and causing to be executed before the clerk a bond to the effect that the defendant will pay the costs of the appeal and perform the judgment which may be rendered against him on the appeal; whereupon, the clerk shall issue an order to the judge or the justice rendering the judgment, to stay proceedings thereon, and to transmit to the office of said clerk all the original papers in the prosecution.

"(2) The applicable provisions governing bail shall apply to the bond provided for in subsection (1).

"(3) After the service of the order to stay proceedings, no execution shall be issued from the inferior court, and any officer on whom the order is served shall return the execution in his hands as suspended by appeal."

12.06 *Schedule and Manner of Trial; Judgment*

"Appeals taken to the circuit court shall be docketed by the clerk thereof as a regular criminal prosecution and shall be tried anew, as if no judgment had been rendered, and the judgment shall be considered as affirmed to the extent of the punishment, if any, adjudged against the defendant in the circuit court, and thereupon he shall be adjudged to pay the costs of the appeal. If an appeal taken to the circuit court be dismissed, the judgment of the court from which it was taken shall stand affirmed and the costs of the appeal shall be paid by the party whose appeal is dismissed."

124

In *Pearce* this Court reaffirmed the restrictions upon heavier sentences after appeal:

"It can hardly be doubted that it would be a flagrant violation of the Fourteenth Amendment for a state trial court to follow an announced practice of imposing a heavier sentence upon every reconvicted defendant for the explicit purpose of punishing the defendant for his having succeeded in getting his original conviction set aside. Where, as in each of the cases before us, the original conviction has been set aside because of a constitutional error, the imposition of such a punishment, 'penalizing those who choose to exercise' constitutional rights, 'would be patently unconstitutional.' *United States v. Jackson,* 390 U. S. 570, 581. And the very threat inherent in the existence of such a punitive policy would, with respect to those still in prison, serve to 'chill the exercise of basic constitutional rights.' *Id.,* at 582. See also *Griffin* v. *California,* 380 U. S. 609; cf. *Johnson* v. *Avery,* 393 U. S. 483. But even if the first conviction has been set aside for nonconstitutional error, the imposition of a penalty upon the defendant for having successfully pursued a statutory right of appeal or collateral remedy would be no less a violation of due process of law. 'A new sentence, with enhanced punishment, based upon such a reason, would be a flagrant violation of the rights of the defendant.' *Nichols* v. *United States,* 106 F. 672, 679. A court is 'without right to . . . put a price on an appeal. A defendant's exercise of a right of appeal must be free and unfettered. . . . [I]t is unfair to use the great power given to the court to determine sentence to place a defendant in the dilemma of making an unfree choice.' *Worcester* v. *Commissioner,* 370 F. 2d 713, 718. See *Short* v. *United States,* 120 U. S.

App. D. C. 165, 167, 344 F. 2d 550, 552. 'This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts. *Griffin* v. *Illinois*, 351 U. S. 12; *Douglas* v. *California*, 372 U. S. 353; *Lane* v. *Brown*, 372 U. S. 477; *Draper* v. *Washington*, 372 U. S. 487.' *Rinaldi* v. *Yeager*, 384 U. S. 305, 310–311." 395 U. S., at 723–725.

This Court today seeks to escape this determination by such conclusions as:

"Our view of the Kentucky two-tier system of administering criminal justice, however, does not lead us to believe, and there is nothing in the record or presented in the briefs to show, that the hazard of being penalized for seeking a new trial, which underlay the holding of *Pearce,* also inheres in the *de novo* trial arrangement. Nor are we convinced that defendants convicted in Kentucky's inferior courts would be deterred from seeking a second trial out of fear of judicial vindictiveness. The possibility of vindictiveness, found to exist in *Pearce,* is not inherent in the Kentucky two-tier system."

To the contrary, appellant's Jurisdictional Statement cites us to an order of the same judge who tried this case *"de novo"* in which he accepted a motion to dismiss an appeal in a similar case with the following statement:

"The Commonwealth Attorney has advised the Court that he does not wish to oppose the defendant's motion to dismiss.

"While the defendant may be correct in his assumption that the citizens of this community have a hostile attitude toward students who would at-

tempt to disrupt the university, it may be that this hostility has been earned, and it is conceivable that a jury composed of citizens of this community might impose a more severe sentence than that imposed in the court below. Nonetheless, the Court after having reviewed the law submitted by the defendant and having conducted its own research of the law is of the opinion that the defendant has a right to dismiss his appeal and that he cannot be forced into a new trial if he does not desire to continue his appeal. For that reason the defendant's motion to have his appeal dismissed be and the same is hereby granted."

The record in this case also shows that the trial judge was informed of the lower $10 fine in the original trial and consequently knowingly increased it to $50. Finally, it should not be forgotten that under this Court's ruling today he could have increased it to $500 plus six months in jail.

The Court suggests that for some reason there is less danger of vindictive sentencing on the second trial in this context than after an ordinary appeal. Specifically, the Court faults the appellant for failing to present evidence that the danger of vindictiveness is as great here as in the precise context presented in *Pearce*. But *Pearce* did not rest on evidence that most trial judges are hostile to defendants who obtain a new trial after appeal. *Pearce* was based, rather, on the recognition that whenever a defendant is tried twice for the same offense, there is inherent in the situation the danger of vindictive sentencing the second time around, and that this danger will deter some defendants from seeking a second trial. This danger, with its deterrent effect, is exactly the same even though the second trial takes place in a different court from the first. Certainly a defendant has good reason to fear that his case will

not be well received by a second court after he rejects
a disposition as favorable as the sentence originally
imposed in this case.

*Pearce* was directed toward a new trial after an ap-
pellate reversal. This case involves a new trial without
an appellate reversal. The core problem is the second
trial. In both cases we have a second full and complete
trial. *Pearce* should control.