[Cite as *State v. Coley*, 2022-Ohio-4123.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
SANDUSKY COUNTY

| | |
|---|---|
| State of Ohio/City of Fremont | Court of Appeals No. S-22-009 |
| Appellee | Trial Court No.  21CRB581A |
| v. | |
| Lawrence Coley | **DECISION AND JUDGMENT** |
| Appellant | Decided:  November 18, 2022 |

* * * * *

James F. Melle, City of Fremont Prosecuting Attorney, for appellee.

Brett A. Klimkowsky, for appellant.

* * * * *

**PIETRYKOWSKI, J.**

{¶ 1} Appellant, Lawrence L. Coley, appeals from a judgment entered by the Fremont Municipal Court, sentencing him to serve 180 days in the Sandusky County Jail. For the reasons that follow, we affirm the judgment of the trial court.

## Statement of the Case and the Facts

{¶ 2} On March 18, 2022, appellant was tried by a jury on one count of aggravated menacing, in violation of R.C. 2903.21(A), a misdemeanor of the first degree; one count of obstructing official business, in violation of R.C. 2921.31(A), a misdemeanor of the second degree; and one count of resisting arrest, in violation of R.C. 2921.33(A), a misdemeanor of the second degree.

{¶ 3} At trial, evidence of the following was adduced. On August 19, 2021, Victim #2 ("V2"), who was the driver of a pickup truck stopped in the carryout lane of a Marathon convenience store, asked the clerk to tell appellant, who was standing at the cash register inside the carryout, that appellant was a bitch. The clerk -- thinking that the statement from the other patron was a joke -- told appellant that V2 had called him a bitch. Appellant responded by running out of the convenience store to confront the instigator. Appellant approached the truck and spat at V2 and V2's passenger, Victim #1 ("V1"). V1 exited the vehicle, reached into the bed of the truck, and momentarily grasped a fishing pole. He also took off his shirt, as if in preparation for a fight. Appellant, who had a license to carry a firearm, raced back to his own vehicle and grabbed a 9mm Ruger. Gun in hand, appellant ran back to the area where V1 and V2 were located and pointed the firearm at the two victims. A bystander who witnessed the situation unfold called 911.

2.

{¶ 4} V1 was the first witness to testify for the state.  He testified that on August 19, 2021, he was seated in the passenger seat of the pickup truck when his cousin, V2, went through the Marathon carryout and told the clerk to inform appellant that "he's a little bitch."  According to V1, appellant had dated V2's girlfriend's sister.  V1 testified that when he and V2 were trying to leave the premises of the Marathon, appellant ran up to the truck and asked, "What did you say?"  When V2 answered, appellant said "fuck you" and spat through the window.  V1 testified that he exited the truck, put his hand on the fishing pole, and then removed his shirt, because appellant was acting in a threatening manner.

{¶ 5} Video of the altercation was played for the jury.  V1 testified that appellant walked up to the passenger side of the vehicle and demanded that V1 "get out of the truck," even though V1 had nothing to do with the altercation.   V1 testified that appellant eventually obtained and drew a gun, and pointed it at first at V1's chest and then at V2's head.  V1 testified that he was scared because appellant "had his finger on the trigger and he was pointing it in my cousin's face, and he's like, say somethin' now, bitch, talkin' all that shit, say somethin' now, fuckin' pussy, cracker, honkies, everything," and that appellant stated, "I'll blow your fuckin' head off."  V1 testified that neither he nor V2 called appellant a racial name.  V1 testified that after appellant walked away from their vehicle, V1 and V2 did not immediately leave the Marathon premises, because they were debating whether they should wait for police to arrive.

3.

{¶ 6} The next witness to testify was V2. V2 testified that he jokingly told the clerk of the Marathon station to inform appellant that "he's a bitch." V2 testified about the altercation and noted that there was a laser sight on appellant's firearm. He testified that he was scared for his life, but later informed investigating law enforcement agents that he did not want to press charges. V2 stated that he knows appellant through "basically my sister-in-law," and that she and appellant "used to go out." V2 testified that V1 was "furious" and "ready to fight" because he had been spat on, and that V1 was "boisterous and loud and cursing and so forth * * *." V2 testified that neither he nor V1 ever said anything of a racial nature to appellant. V2 testified that appellant called him a "white cracker, piece of shit, whatever, you know * * *."

{¶ 7} Dianna Nevius, who was the third witness to testify, stated that she witnessed the altercation while she was getting gas for her vehicle, and that she called the police. She testified that when she saw appellant with the gun she was shocked, and that she feared for the people in the truck and for the other people who happened to be present on the Marathon premises.

{¶ 8} The fourth witness to testify, Lataya Domanski, was the clerk at the Marathon convenience store who had relayed the "joke" from V2 to appellant. Domanski testified that after the incident, she immediately quit her job and did not even give her employer two weeks' notice.

4.

{¶ 9} Fremont Police officer Vincent Bocardo, who was one of the officers who was dispatched to the scene, was the fifth witness to testify. He stated that when he attempted to search appellant, appellant "wound up with his elbow" and gave Bocardo a "forceful shot" to his chest that knocked Bocardo's body camera to the ground. Bocardo testified that he "started wrestling with" appellant and that he and other officers tried to place appellant in handcuffs, but that appellant would not allow it. At that point, Bocardo determined that appellant was resisting arrest.

{¶ 10} Fremont Police sergeant Scott Rosenberger, the sixth witness to testify, stated that while Officer Bocardo was checking to make sure that appellant was not carrying a gun, appellant spun around, preventing the officer from patting him down.

{¶ 11} The seventh witness to testify, Fremont Police patrolman Christian Ortolani, was the person who transported appellant to jail. According to Patrolman Ortolani, appellant, while discussing the incident that had just taken place with police, stated that he had "blacked out" and that "his adrenalin was going."

{¶ 12} Fremont Police sergeant Nancy Belinda Rosenberger, the eighth witness to testify, stated that she heard appellant yell at Bocardo and saw appellant "kick back his elbow," and that, because appellant was not being compliant, three officers, including herself, "ended up basically struggling with [appellant]." She testified that police had given him warnings, but that, ultimately, three officers were required to take appellant to the ground. After this witness's testimony, the state rested its case-in-chief.

5.

{¶ 13} The defense called appellant to testify. Appellant stated at the outset that he had a license to carry a concealed pistol. He testified that when he left the convenience store to investigate the reason for the name-calling, the truck carrying V2 and V1 lunged forward as if to hit him, and then the passengers called him a "bitch ass n****" and threatened to "fuck [him] up." Appellant stated that he gets mad "any time two white men in a truck call [him] a n**** and say they're gonna fuck [him] up," so he grabbed his firearm, pointed it at V2 and told him, "[C]all me n**** now, call me a bitch now, fuck me up now." According to appellant, V2 just looked at him and did not say anything, while clerk Lataya Domanski, who was standing next to appellant, kept saying, "no, no, no." Appellant stated that Domanski's words "cleared [his] head a little bit," and that he went back to his vehicle, and put the gun back in the holster and under the seat. Even at this point, he stated, he was continuing to exchange words with the victims. He stated that he was glad to learn that police were on the way, so he could "file a report."

{¶ 14} Appellant stated that he went back into the store to wait for the police and became "irritated" when Officer Bocardo entered the store and immediately asked appellant whether he had pulled a gun on someone. When Bocardo asked appellant whether he currently had a gun on his person, appellant answered that he did not and then told Bocardo that Bocardo was welcome to search him. Appellant testified that after Bocardo patted him down, Bocardo grabbed his wrist "really hard," and that it hurt, causing him to "snatch away" from Bocardo.

6.

{¶ 15} Appellant testified that he suffered bruises and injuries due to the officers' behavior.

{¶ 16} At the conclusion of the trial, the trial court instructed the jury on the affirmative defense of self-defense, appropriately advising that it was the state's burden to prove that appellant's use of self-defense was not justified. Ultimately, the jury found appellant guilty of the charge for aggravated menacing, but not guilty of the charges for obstructing official business and resisting arrest.

{¶ 17} At sentencing, the court considered appellant's prior record and listened to statements by the state, defense counsel, and appellant. The state, seeking a more severe sentence than was ultimately imposed, argued that the trial court should "send a message in the City of Fremont" due to "the new law that's coming into effect about not having to even have a CCW * * *."

{¶ 18} The court, addressing appellant, stated as follows:

Mr. Coley, the Court does have to look at certain factors when the Court imposes sentence in any matter. Those factors are in the Revised Code 2929.21 and [2929.22].[1] I have considered those factors. I've looked at a lot of different things.

I will say, at the beginning, three things stick out in my mind as a result of observing this trial from up here.

---

[1] Although the transcript incorrectly reads "2921.22," the sentencing journal entry provides that the court properly considered the factors set forth in R.C. 2929.22.

First and foremost, it is the images of Lataya Domanski stepping between you and the occupants in that car while this whole thing was going on, putting herself in danger. I couldn't believe that she did that.

The second thing that strikes me from watching all that video is, secondly, with Ms. Domanski when she stepped between the little boy on the bike and ushered him out of the situation and what was going on there. Those two didn't ask to be involved in this. They didn't call anybody names. They were just working in there, getting candy, and those people were both in harm's way as a result of your actions.

And the second thing is that Diannaa Nevius who testified, and I can see her vividly in her tie-dyed shirt, crouching behind her vehicle after she had gassed up, not knowing if she was going to be shot or in the middle of the crossfire or what, but she clearly knew that there was a gun, and she was scared, and she didn't ask to be put in that situation either.

And the third thing was the rage and the anger that you displayed during the course of this in your language, in your behavior to law enforcement and to, I mean, Officer Rosenberg was trying to calm you down, and I'm not going to repeat – you know what you said. We've heard it on the video. I was struck by your rage, your rage after law enforcement was involved.

The jury has spoken in this matter. The jury has decided, after hearing your testimony and all the testimony of the witnesses, that they have found you guilty of this offense.

**You need to be held to a higher standard. You went and took a class and had a CCW and they educated you on how to handle weapons, what to do with weapons, and I hold you to a higher standard than anybody else because you took it upon yourself to be educated and know how to handle a weapon, and you chose on August 19th to go back to your vehicle and get that weapon and bring it out, and not only bring it out, but placed a dot on the tracer on the chest of those individuals.**

**\* \* \* You obviously don't know what you're doing with a firearm because you pulled a firearm out and pointed it at somebody in a parking lot with cars and people because of words. This all started because of words.**

When your attorney says that [V2] doesn't think this was a big deal, there's more victims than just \* \* \* [V2]. \* \* \* [T]he victims are the people that were there getting gas. The victims are the public. The victims are law enforcement. The victims are anyone else that were there that day when that happened and society in general. I have an obligation to protect the

public and to protect them from future crime by you and punish you and this is what I'm balancing here.

I mean, I'm looking at the impact of [V2], which it sounds like that's a daily occurrence with them. I don't know, they argue, they fight, they take their shirts off, they scream and yell at each other, but you engaged in it also and you could – you chose to engage him and now you're sitting here. So I'm looking at that impact, which I don't factor very highly.

I look at the need to change your behavior. Can we change your behavior.

First and foremost, you're going to have to get some type of anger assessment because there's something deep brewing inside of you. I watched you numerous times and the anger and the names that you called people, you know, I was very struck by that.

The Court also has to find can you be rehabilitated. I think you can. [The Prosecutor's] asking for 120 days in jail. I think that's severe, but that being said, I think that a jail sentence is warranted because I think it would demean the seriousness of your conduct if there was [sic] jail.

I mean, this isn't your first offense with law enforcement. This isn't your first conviction. You had a violation of a protection order in 2016. You didn't see any jail time. You were given probation.

2012 you had an assault, offense of violence, 10 days in jail, 10 days suspended.

2018, disorderly conduct.

You've been involved in the criminal justice system. You've been given opportunities without jail and you're back again at age 47. I just feel the nature and the circumstance of this crime warranted – warrants jail, but I don't feel that you are not amenable to probation.

(Emphasis added.)

{¶ 19} Following this statement, the court went on to sentence appellant to serve 180 days in the Sandusky County Jail, with 120 of the days ordered suspended. Appellant was given credit for two days in jail that he had already served, and he was informed that he was eligible for good time credit on his 60-day sentence. Finally, the trial court ordered a three-year period of probation[2]. Appellant was immediately remanded into custody to begin his jail sentence.

---

[2] Prior to amendment of R.C. 2951.02 and enactment of R.C. 2929.25 under H.B. 490, effective in 2003, the term "probation" was used when referring to suspended sentences for misdemeanors. *See* former R.C. 2951.02. With the statutory change, the term "community control" applies. *See* R.C. 2929.25. We use the term "probation" here, as this was the term that was used by the court below.

**Assignment of Error**

{¶ 20} Appellant asserts the following assignment of error on appeal:

I. The Trial Court's sentence of Lawrence L. Coley ("Appellant") violates the Due Process Clause of the Fourteenth Amendment to the United States Constitution insofar as the Trial Court based its original sentence in part upon Appellant electing to exercise Appellant's statutory right to obtain a license to carry a concealed firearm.

**Analysis**

{¶ 21} Appellant argues in his first assignment of error that his sentence is in violation of the Due Process Clause of the Fourteenth Amendment to the United States Constitution, because it is based in part on the trial court's "animus" towards appellant "for electing to exercise [his] statutory right to obtain a license to carry a concealed firearm." Specifically, appellant argues that "[i]t was legally wrong for the Trial Court to hold Appellant to a 'higher standard' for exercising his statutory right to obtain a license to carry a concealed firearm than someone who did what Appellant was alleged to have done to Appellant's purported victims, but without first having obtained a similar license." Thus, the question before us is whether appellant's sentence is contrary to law because the trial court vindictively imposed a sentence in retaliation for appellant's exercise of his right to carry a concealed weapon.

{¶ 22} The law is clear that "'[t]o punish a person because he has done what the law plainly allows him to do is a due process violation of the most basic sort * * *,'" *State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 8, citing *Bordenkircher v. Hayes*, 434 U.S. 357, 363, 98 S.Ct. 663, 54 L.Ed.2d 604 (1978). (Additional citation omitted.)

{¶ 23} "Ordinarily, appellate courts defer to trial courts' broad discretion in making sentencing decisions." *Rahab* at ¶ 10. However, courts have reversed sentences that are based upon vindictiveness, whether "presumed" or "actual." Courts have found it necessary to "presume" vindictiveness in only a very narrow set of cases in which action detrimental to the defendant was taken after exercise of a legal right. *See Rahab* at ¶12-13; *see, e.g., North Carolina v. Pearce*, 395 U.S. 711, 738, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (where defendant had successfully appealed and then, upon retrial and conviction for the same offense, received a harsher sentence, a presumption of vindictiveness arose); *but see Colten v. Kentucky*, 407 U.S. 104, 116-118, 92 S.Ct. 1953, 32 L.Ed.2d 584 (1972) (presumption not extended to situations in which a defendant is sentenced more harshly after seeking a de novo trial with a superior court in a two-tier system). "So narrow is the application of the * * * presumption that it has been referred to as an 'oddity' and 'an anomaly in our law, which ordinarily "'presum[es] * * * honesty and integrity in those serving as adjudicators.'" *Id.* at ¶ 13, citing *Plumley v. Austin,* 547

13.

U.S. 1127, 135 S.Ct. 828, 190 L.Ed.2d 923 (2015) (Thomas, J., dissenting from denial of certiorari). (Additional citations omitted.)

{¶ 24} In determining whether to apply such a presumption, a court must consider whether there is a "'reasonable likelihood' * * * that [a] sentence is the product of actual vindictiveness on the part of the sentencing authority." *Id.* at ¶ 14, quoting *Alabama v. Smith*, 490 U.S. 794. 799. 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989). Applying this standard to the instant case, we do not find that there is a reasonable likelihood that a sentenced imposed on an individual licensed to carry a concealed handgun will be the product of vindictiveness. We, therefore, decline to apply a presumption of vindictiveness, and instead conclude that appellant must prove actual vindictiveness. *See id.* at ¶ 18 (where court does not apply a presumption of vindictiveness, the appellant is required to prove actual vindictiveness).

{¶ 25} In determining whether there is evidence of actual vindictiveness, we must review the entire record, including the trial court's statements, the evidence adduced at trial, and the information presented during the sentencing hearing. *See State v. Rahab*, 150 Ohio St.3d 152, 2017-Ohio-1401, 80 N.E.3d 431, ¶ 19. We will reverse the sentence only if there is clear and convincing evidence that the sentence is contrary to law because it was imposed as a result of actual vindictiveness on the part of the trial court. *See id.*

{¶ 26} As a general rule, a trial court imposing a sentence for a misdemeanor offense must consider the purposes and principles of misdemeanor sentencing as set forth

14.

in R.C. 2929.21, as well as the sentencing factors set forth in R.C. 2929.22. Under R.C. 2929.21, a trial court "shall be guided by the overriding purposes of misdemeanor sentencing," which are "to protect the public from future crime by the offender" and "to punish the offender." To achieve these purposes, R.C. 2929.21 provides that a trial court "shall consider the impact of the offense upon the victim and the need for changing an offender's behavior, rehabilitating the offender, and making restitution to the victim * * *." "[W]hen a misdemeanor sentence is imposed within the statutory limits, a reviewing court will presume that the judge followed the statutes, absent evidence to the contrary." *State v. Rivera*, 6th Dist. Wood Nos. WD-19-085, WD-19-086, 2021-Ohio-1343, ¶ 19.

{¶ 27} Here, there is no question that the trial court considered the appropriate sentencing criteria -- including the purposes of protecting of the public from future crime by the offender and punishing the offender and how to achieve those purposes -- and, further, imposed appellant's sentence within applicable statutory limits.

{¶ 28} As evidence that the trial court acted vindictively, appellant points to that portion of the sentencing transcript wherein the trial court stated:

> You need to be held to a higher standard. You went and took a class and had a CCW and they educated you on how to handle weapons, what to do with weapons, and I hold you to a higher standard than anybody else because you took it upon yourself to be educated and know how to handle a weapon * * *.

15.

{¶ 29} Here, the judge was correct when he told appellant during sentencing that because appellant had taken a class on how to handle a firearm, he should have known that the circumstances of this case, which involved a mere exchange of words, did not warrant his brandishing a weapon at all, let alone in public, on a business property full of innocent bystanders. Thus, we find that appellant was punished, not for having the CCW, but for ignoring information that happened to come with, and was known to have been imparted to appellant, during appellant's CCW training. In this, there is no evidence to suggest that the trial court acted at all vindictively.

{¶ 30} Though the trial court's words could have been more artfully articulated, a thorough review of the record convinces us that the court sentenced appellant, not as the result of vindictiveness, but rather on the evidence of the impact that appellant's crime had on the public, appellant's prior record – which included a violation of a protective order, an conviction for assault, and a conviction for disorderly conduct – and appellant's intense level of anger, as perceived by the trial court. Accordingly, appellant's assignment of error is found not well-taken.

{¶ 31} For all of the foregoing reasons, the judgment of the Fremont Municipal Court is affirmed. Appellant is ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

16.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Mark L. Pietrykowski, J.      _____
JUDGE

Gene A. Zmuda, J.

Myron C. Duhart, P.J.      _____
CONCUR.                               JUDGE

_____
JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.