Roger Staton appeals from his conviction in the Butler County Court of assault after a jury trial. A previous conviction after a bench trial was reversed by this court for procedural error.
 Staton was charged with assaulting Ronald Dickson on November 4, 1996. On that date in the early afternoon Roger Staton was pedaling his bicycle westbound on Brookville Road in Butler County approaching the intersection of Riggs Road which runs north and south. Staton's intention was to turn south onto Riggs Road and proceed to his home, which was several minutes by bicycle from the intersection. Approaching the intersection from the north was Dickson, driving his wife's Mercedes. Dickson was a neighbor of Staton's. Dickson was late for an appointment in College Corner, Ohio, and had just discovered he had left something at his house. He had turned his car around to pick it up and he didn't want to "get caught" behind Staton's bicycle.
Dickson testified that he stopped his car at the intersection and then proceeded through it as he judged Staton to be a safe distance away. He testified, as he proceeded through the intersection, he saw Staton lift his hands from his bicycle, give him the "finger" and shout "You mother fucker, you ran the fucking stop sign."
Dickson testified he saw Staton pedal his bicycle as fast as he could in the direction of Dickson's car. Dickson said he looked in his rear view mirror and saw Staton "spitting and slobbering . . . like he was crazy." (Tr. 68). Dickson said he stopped his car to see what was wrong with Staton. Dickson testified his driver's door window was broken so he opened the car door and stuck his head out. Dickson stated that Staton rode his bike right up to his driver's door and he asked Staton what his problem was.
Dickson testified that Staton stuck his fingers right up to his face and kept repeating "you ran the fucking stop sign." (Tr. 70). Dickson then testified to the following:
 MR. DICKSON: At that point he said uh, "what did you say you mother fucker, repeat that again." Take that toothpick out of your mouth and say it again." I had a toothpick in my mouth. I took the toothpick out of my mouth and at this point he was inside of my door. His bicycle wasn't, you know, he wasn't banging on anything but he right in the, it was like a 90 degree angle and the tire of his bicycle and he was on the right over by his handlebars and it fits in there perfectly. Uh, he shifted over to his left foot when, when I said you don't have any respect for your wife and he said what I just repeated. And then he said take your toothpick out of your mouth and repeat what I said. When I did that he shifted over to his right leg, which made him closer to me and I looked up at him and I said, you don't even have any respect for your wife, you let her ride right in the middle of the road. He said you mother fucker I'm going to kick your ass and he swung down at me in the car. I put my arms up to block the punch and I went out of the car. He tripped over his bicycle. And fell on the ground.
 PROSECUTOR: Now when you say you went out of the car describe how you exited the car?
 MR. DICKSON: Well, when I was looking up at him and he brought his fist down all I did was . . . actually I closed my eyes and put my hand up like this to block his punch and there was no place else for me to go. There was a board running across the front seat to the back seat. It is a bucket seated car. The car was in park. And he is swinging trying to sucker punch me. So my natural instinct was to get out of that car. And so I went out of the car and he uh, lurched backwards and tripped over his bicycle. His bicycle uh, flipped out from underneath him and his uh, part of his bicycle whether it be his uh, I don't know what part it was it could have been the chain or the pedal or the tire hit me on my shin as I first, as soon as I hit my, stepped out of the car on my way out that bicycle whacked me right on my shin. It wasn't nothing that was disabling but I felt something.
PROSECUTOR: What happened next?
 MR. DICKSON: Uh, went [sic] I got out of my car the bicycle was uh, in the uh, would be the northbound lane, uh, catty-cornered across the highway. He was on one side of the bicycle and I was on the other side of the bicycle. The next thing I remember that he was basically on his rear end with his hands back like this and he got up and he starts jumping up and down like a boxer, just like this. It was really strange. He said I am going to kick your mother fucking ass just like that at me and there was a bicycle across from him
 PROSECUTOR: What did you . . . at that point what was your feeling?
 MR. DICKSON: My feeling was that we were going to get in a fight. And I hadn't at that time except what I said, I had never raised my voice at him. I never cussed at him. I had done nothing to this man until he swung at me. You know, and then I got out of the car. At that point, uh, because I just, I'm, well at that time I was 50 years old. I've never been in a fight since I've been 18 years old so you know, I had no idea of uh, of uh, or even any thought of getting in some kind fight with my neighbor, a stranger that I have never met before. Uh, out of Riggs Road. But anyway because he told me, because he told me with his fist up that he was going to beat my mother fucking ass, and that's what he said to me, I put my hand up and I said go ahead and I will knock your fucking head off. And that's what I said to him.
PROSECUTOR: What did he do then?
 MR. DICKSON: At that moment again, he is on the other side of his bicycle. I mean, I was, like I am right now, nervous as could be. Just talking about it. And I mean, he was strange the whole time. But when I said that his eyes kind of went doopity-do a little bit and he just stopped real quick and he looks down to his bicycle. I said well, at that point and then he reached down towards his handle bars and there was a pouch on his bicycle. And I am thinking, oh, what's he going to do. I said, I bet he has got some pepper spray in there. Uh, and he is probably going to spray me. And so I turned and headed back towards my car. I mean we are not talking about a very far distance. I'm just starting to turn away. As I started to turn but I am still, I'm still watching him. And I seen him pull out this far and it is blue and I recognized it immediately that it was one of these bicycle chains that you rap around a telephone pole if you tie your bicycle to it. And he just kept pulling and he pulled it out. He pulled it out like this and he went (HA) at me like that. And he was gritting his teeth at me just like that. He just, he was looking crazy. And I pointed to him and I said . . .
 PROSECUTOR: Just for the record the witness indicated he held the chain over his head. Reserve the record.
 MR. DICKSON: Like, he held the chain over his head like this and he looked at me like that.
 PROSECUTOR: You might want to sit down so it will pick up your voice.
 MR. DICKSON: It's hard to demonstrate sitting down but uh, and I pointed to him and I said you hit me with that chain and I will have you arrested. Again and his eyes went (ddd) a little bit and he just kind of stopped for a second. And it just went . . . he went like this with the tape and the chain tight over his head, took that chain and went around like that and sliced me right across the back. And I turned as he, as he was uh, swinging the chain to get out of the way, I basically, I said don't you hit me with that chain or I will have you arrested and I turned as he swung the chain just to get away. And he whacked me right across . . . diagonal strike across my back.
Dickson said he then jumped in his car and drove home. When he arrived, the stone mason, Douglas Stamper, was working in Dickson's backyard. Dickson testified he told Stamper what happened with Staton. Dickson said he then felt something on his leg and when he pulled up his pants he noticed blood running down his leg where Staton's bike struck him.
Dickson said he then called the police to report the incident. Police and emergency personnel arrived and Dickson showed them where he had been struck across his back with the chain. A few hours later Dickson went to the hospital and was further examined. The doctor took a Polaroid picture of Dickson's back. (State's Ex. 1).
Dr. William Ross testified he examined Dickson at the emergency room at McCullogh Hyde Hospital on the day of the incident. Dr. Ross testified he observed a contusion on Dickson's back and the injury was consistent with Dickson's statement to him of how he was injured by Mr. Staton. Dr. Ross testified the injury appeared to have occurred within the last 12-24 hours. (Tr. 234).
In his defense, Mr. Staton called Dr. Ronald Huston, a professor of mechanical engineering at the University of Cincinnati to the stand. In addition to his teaching duties, Dr. Huston testified he did consulting work on the side. Dr. Huston testified he worked in the field of biomechanical engineering which he described as applying mechanical engineering principles to living systems. He stated he had testified as an expert in court matters about five hundred times. (Tr. 347).
Dr. Huston testified he teaches biomechanics at the University of Cincinnati, and one of the courses is tissue biomechanics. He testified he was familiar with chain dynamics and that the law of physics involving chains is not profound. The following testimony was elicited from Dr. Huston.
 MR. STATON: Dr. Huston have you studied and done experimentation regarding the movement of chains which are swung in a certain direction?
DR. HUSTON: Yes I have done that.
 MR. STATON: And can you determine from your education and experience as to what uh, angle the chain would come against an object if swung around?
DR. HUSTON: Yes I can do that.
 MR. STATON: Okay. And can you give an opinion as to what type of angle or direction the mark from the chain would make if it is swung in the right hand, counter clockwise over the head and brought down?
DR. HUSTON: Yes, I can do that.
MR. STATON: And what is that opinion?
PROSECUTOR: I am going to object again as the mark.
JUDGE: Overruled.
 DR. HUSTON: Well the opinion is simply that if you take the chain in the right hand as you said, then the uh, as you are swinging the chain around uh, the highest point of the chain would be where the hand is and then the gravity would hold it down and then as you swing it and release it then the chain would, would go down. Simply would uh, would be directed downward.
 MR. STATON: Dr. Huston could you please come up to this pad and uh, draw what type of mark the chain would make? The direction of the mark.
PROSECUTOR: I am going to object again Your Honor.
JUDGE: Alright [sic] the Court notes the objection.
MR. STATON: I'm sorry.
JUDGE: Court notes the States [sic] objection.
 DR. HUSTON: Well if uh, if I were holding the chain and let's say the chain was (UNABLE TO TRANSCRIBE) and I swing it it will come down in the direction. (UNABLE TO TRANSCRIBE) go that way. Now the kind of mark it makes depends upon how hard (UNABLE TO TRANSCRIBE).
* * * *
 DR. HUSTON: Should I repeat it Your Honor. Okay. If I'm holding the chain in my right hand and I swing it and let it go, right like that then it would be directed downward and to the right. As I have drawn there. In terms of a mark, uh, that would depend upon how hard it is.
 MR. STATON: Okay in terms of how visible the mark is?
 DR. HUSTON: Yes. Or how prominent or whatever. But the direction that the chain would go would be in this direction.
 MR. STATON: Okay. So that would mean that the direction of the mark would be from the lower right to the upper left?
 DR. HUSTON: Well it depends on how you view it. As I am standing here of course it would be from my upper right down to the lower left. If you look at it this way then of course it would be from the left down to the right.
 MR. STATON: Thank you. Uh, you may return to your seat there for a moment.
 MR. STATON: Now Dr. Huston could you explain to the ladies and the gentleman of the jury why and please in simple terms so that we all can understand, why the mark would go in this direction as opposed to any other direction? For example here over to here.
 DR. HUSTON: Well, yeah, it isn't hard at all to see that because if you have your hand above, above the paper uh, like up at the left hand corner as we are looking at it and then the only way the chain can go is down to the right. That is you couldn't get it going from the bottom up because your hand is up there. I mean it just . . . it's really not very complex at all. It's just the simple gravity and the direction of the chain.
 MR. STATON: And is this a universal law of physics that would apply?
 DR. HUSTON: Oh sure. This isn't very profound. Right. This is just gravity. It is the principle of physics.
 MR. STATON: Now Dr. Huston I would like to show you uh, may I see uh, I think it's State's exhibit 1, Your Honor. I would like to show you State's exhibit 1, uh, which is a photograph and do you see a mark on that photograph?
DR. HUSTON: Yes I do.
 MR. STATON: And can you tell us in what direction that mark is going on the photograph?
 DR. HUSTON: Well this is a photograph of a persons [sic] back and then looking at it from the back in the same direction that the person would be looking. The mark is going from the lower left to the upper right.
MR. STATON: That would be like this?
DR. HUSTON: Yes. In that direction.
MR. STATON: Okay.
DR. HUSTON: That is correct.
MR. STATON: Maybe not that . . .
 DR. HUSTON: It's n . . . that's not to scale. But that's the general direction. That's right.
MR. STATON: And that is opposite . . .
 PROSECUTOR: I'm going to object and ask that the testimony on the mark on the back be stricken.
MR. STATON: Your Honor if he may . . .
* * * *
 JUDGE: Alright [sic]. Uh, Dr. Huston is going to testify as to uh, in relation to the mark that is depicted on the uh, complaining witnesses back in State's exhibit number 1. Uh, the Court is instructing you that he is just merely taking this mark and uh, showing it as to the law of physics with regard to the facts that Mr. Staton has presented to him. The Court further instructs you that you are not to associate this with causation. Uh that uh, whether or not the chain did in fact cause these marks can not be inferred by the jury at this time based upon this testimony. Okay. They are merely doing an illustration as to the laws of physics. You may proceed.
 MR. STATON: Thank you. Now Dr. Huston, uh, in regard to swinging the chain in the right hand over the uh, excuse me, counter clockwise over the head and bringing it down does it matter to you in giving your testimony as to what angle the mark would be made as to what the object is that the chain strikes?
 DR. HUSTON: I'm sorry I don't understand the question.
 MR. STATON: I know and I'm not asking it very well. Does it matter to you what object the chain is striking as to what angle the marks would be made?
 DR. HUSTON: Oh, no. In other words you could strike a piece of paper. You could strike a wall. You could strike a tree. You could strike a person and it doesn't matter.
MR. STATON: Doesn't matter.
 DR. HUSTON: No matter what you strike . . . the angle is determined by the gravity. It's not determined by what you hit. (Emphasis ours).
Mr. Staton then asked Dr. Huston whether using applied physics he could offer an opinion whether a particular chain made a particular impression on a particular object. Dr. Huston stated he could do so as part of his expertise. He stated this expertise is related to impact engineering of which he had done some work and was part of his training in mechanical engineering. (Tr. 368). Dr. Huston testified he would expect the chain would produce uniform breaks in the pattern from striking a surface.
Mr. Staton asked Dr. Huston if he had an opinion whether the mark depicted on Mr. Dickson's back as seen in the photograph was consistent with being created by defendant's chain. The trial court sustained the prosecutor's objection to Mr. Staton's question. (Tr. 370). Mr. Staton then proffered Dr. Huston's opinion that the pattern "that you see in State's Exhibit 1 (the photograph) is different than a pattern that would be made by State's Exhibit 2." (Tr. 372).
Back in the presence of the jury, Mr. Staton asked Dr. Huston if he had viewed a videotape wherein Mr. Dickson demonstrated how the defendant struck him with the chain with his right hand.
The following testimony was elicited from Dr. Huston:
 MR. STATON: And that's the same type of movement that you testified would cause the angle which you have indicated would be from the left side up to the right? Or what ever way we were looking at it here?
DR. HUSTON: Yes the same.
 MR. STATON: And do you have an opinion based upon a reasonable degree of scientific certainty as to whether the mark which is displayed in the photograph in front of you, State's exhibit 1, was caused by exhibit 2?
PROSECUTOR: Objection.
JUDGE: Sustained.
 MR. STATON: I would like to proffer for the record Your Honor.
 JUDGE: Alright [sic]. Well, I'm going to have to ask you to be excused one more time so we can put uh, this testimony on the record. It shouldn't take to long.
 JUDGE: Alright [sic]. Let the record reflect the jury has va . . . is outside the presence of the courtroom. You may proceed?
MR. STATON: Do you have such an opinion?
DR. HUSTON: Yes I do.
MR. STATON: And what is that?
 DR. HUSTON: My opinion is that the uh, mark that is shown on uh, uh, or excuse me, State's exhibit 1, is uh, would not have been caused by the uh, chain, which I believe is State's exhibit 2.
MR. STATON: Yes correct.
DR. HUSTON: Yes. That's correct.
 MR. STATON: And your Honor if I may have one more proffer while the jury is out?
JUDGE: Sure.
 MR. STATON: And uh, as to your testimony regarding uh, impact, uh, the impact of the chain do you have an opinion as to whether the impact pattern, uh, made by State's exhibit 2, would be the same as the impact pattern which we see in State's exhibit 1, the photograph?
DR. HUSTON: Yes I have an opinion about that.
MR. STATON: And what is that?
 DR. HUSTON: My opinion is that the pattern shown in State's exhibit 1, is different than the pattern that would be made by State's exhibit 2.
During final argument, Mr. Staton reminded the jury that Dr. Huston had testified that the angle of the contusion on the victim's back was not consistent with the victim's version of how he was struck. When Staton attempted to inform the jury that Dr. Huston had also opined that the defendant's wrapped bicycle chain would not have caused the "pattern" of the victim's contusion, the prosecutor objected and noted that the latter opinion was not in evidence. (Tr. 5(A)). The judge then informed the jury that Dr. Huston was permitted to "show what direction and according to the laws of physics that the chain would have traveled" in accord with the victim's testimony. (Tr. 5(A)).
In his first assignment of error, appellant contends the trial court erred in excluding Dr. Huston's testimony. He argues that Dr. Huston was precluded from introducing evidence that the direction of the scar was inconsistent with the prosecuting witness' testimony, that the impact pattern made by the chain would be different than the pattern depicted in the photograph, and that the injury was consistent with a theory of self-infliction by the prosecuting witness.
The State argues that the trial court did not abuse its discretion in denying the admission of Dr. Huston's testimony because he did not view the wound, did not simulate the incident, did not review any data on the causation of bruises in human skin before testifying, and was not a medical doctor.
At the liminal hearing the trial court explained why it would not permit Dr. Huston to testify whether the defendant's chain caused the victim's injuries:
 JUDGE: Well. Here's the concern of this Court. Concern of this Court that uh, there has been no testimony from the expert with regard to any experimentation on the chain. He said he's merely looked at it. Uh, he has uh, I don't know exactly as to the extent that the expert has looked at the victim's medical record. He is not a doctor so the Court will allow the expert to testify within his expertise of mechanical engineering and that the basic principles of mechanics with respect to the chain. Uh, the Court will not allow any expert testimony from Dr. Huston with regard to causation or the lack thereof. He can not say it was caused, injury was caused or it was not caused. But as fair as the chain is concerned and uh, I think on the bicycle, uh, with regards to principles of uh, well, see he hasn't done any testing on the bicycles. Uh,
 MR. STATON: May I ask Dr. Huston if he is familiar with the . . . he did testify he is familiar with the mechanics of movement of a bicycle.
JUDGE: Right.
 PROSECUTOR: I think that's also something that is within the knowledge and understanding of the ordinary person. How an object would fall.
 MR. STATON: I would disagree in terms of a bicycle. Because it has particular aspects to it. Peddles and chains and things of that sort. Which could effect the movement of the bicycle. And its certain level of gravity within the bicycle.
 JUDGE: See you are getting into so many different factors. You've got the weight of the bicyclist. You've got the location of the body on the bicycle. You've got uh, surface. And you've got other uh, other factors as . . . I mean it could be weather too. It could be temperature. All of these effectiveness. Uh, and without running any particular test, uh, and because he is familiar with it doesn't mean he's ran any scientific tests and done any specific testing. And I think that is that we will let the jury decide that. So I am limiting Dr. Huston's testimony as to uh, the principles of mechanical engineering with respect to the chain. And he can not talk as far as what caused an injury or what did not cause an injury.
 MR. STATON: But he can speak, if I may clarify Your Honor, he can speak in terms of the way a chain moves when it is swung in a certain way? As far as what part would be lower, what part would be higher?
JUDGE: Yes. That's all part of . . .
 MR. STATON: Okay. Yeah. Okay. (Tr. 54, 55).
The determination of whether a witness possesses the qualifications necessary to allow expert testimony lies within the sound discretion of the trial court. In addition, the qualification of an expert witness will not be reversed unless there is a clear showing of an abuse of discretion on the part of the trial court. State v. Maupin (1975), 42 Ohio St.2d 473, Statev. Minor (1988), 47 Ohio App.3d 22.
Evid. R. 702 reads as follows:
 A witness may testify as an expert if all of the following apply:
 The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 The witness' testimony is based on reliable scientific, technical, or other specialized information. To the extent that the testimony reports the result of a procedure, test, or experiment, the testimony is reliable only if all of the following apply:
 The theory upon which the procedure, test, or experiment is based is objectively verifiable or is validly derived from widely accepted knowledge, facts, or principles;
 The design of the procedure, test, or experiment reliably implements the theory;
The particular procedure, test, or experiment was
 conducted in a way that will yield an accurate result.
In Shilling v. Mobile Analytical Services, Inc. (1992),65 Ohio St.3d 252, the Ohio Supreme Court held that a non-physician neurotoxicologist was qualified pursuant to Evid. R. 702 to render an opinion that the ingestion of gasoline caused injury to the brain and nervous system. Justice Herbert Brown noted at page 254 of the Court's opinion:
 Dr. Singer has an extensive and impressive vita dealing with psychology, biological effects on the central nervous system, and neurotoxicology. He has been a fellow at the National Institute of Health and at the Mount Sinai School of Medicine, has won the NIH National Research Service Award, and has a long list of publications dealing with neurotoxicity and its effects. He is qualified by "knowledge, skill, experience, training, or education" to testify on the subject of toxicity of gasoline on the human nervous system.
In the matter sub judice, Dr. Huston was certainly qualified to render an opinion concerning the mechanical characteristics of the chain and whether the direction of the contusion as depicted in the photograph was consistent with the victim's version of how the defendant struck him with it. The trial court erred when it instructed the jury that Dr. Huston's testimony was admissible merely as an illustration as to the laws of physics, but was not admissible on the issue of causation.
We cannot say, however, that the trial court abused its discretion in denying the admission of Dr. Huston's testimony that the pattern of the contusion or bruise was inconsistent with being struck with the defendant's chain. Dr. Huston's expertise was in mechanical engineering, not medicine. Dr. Huston testified he "talks about tissue biomechanics and degradation of tissue in his course in biomechanics," but he didn't need that expertise to determine that the bruising caused the victim was not caused by the defendant's claim. (Tr. 28).
The trial court was not required to believe that Dr. Huston could simply look at a photograph of a bruise and determine that the "pattern" of the bruise could not have been made by a particular object without providing a stronger foundation for offering such an opinion. Importantly, Dr. Huston did not explain the principles and methods employed by him to reach that conclusion. The first assignment of error is Sustained in part and overruled in part.
In his second assignment, appellant contends the trial court erred in instructing the jury that it was not to associate Dr. Huston's testimony with the issue of causation. The defendant contends Dr. Huston's testimony was offered for the sole purpose of establishing that the defendant could not injure Mr. Dickson's back with the bike chain in the manner described by the victim and the bruise pattern was not consistent with being inflicted by the chain.
As indicated in our discussion of the first assignment, Dr. Huston's testimony concerning the "angle" of the back injury was directly relevant to whether the defendant caused the victim's injury and the testimony was based on reliable science. The trial court's instruction that this testimony could not be considered for causation purposes was clearly erroneous. Accordingly, the second assignment is Sustained in part.
In appellant's third assignment, he contends the trial court erred in refusing to give his requested instruction on the affirmative defense of self-defense.
A person who is without fault may defend himself with the use of non-deadly force. State v. Fox (1987), 36 Ohio App.3d 78, 80. This is a simple assault case, and an accused is justified in using force "against the imminent use of unlawful force as long as it was not likely to cause death or great bodily harm. Columbusv. Dawson (1986), 33 Ohio App.3d 141,142.
Only a defendant who was not at fault in creating the situation giving rise to the affray may resort to the use of force. State v. Robbins (1979), 58 Ohio St.2d 74, 80. The defendant must have reasonable grounds to believe and an honest belief that he is in immediate danger of bodily harm and his only means to protect himself was by the use of force to protect himself was by the use of force not likely to cause death or great bodily harm. Self-defense is an affirmative defense because the justification is peculiarly within the knowledge of the defendant.State v. Williford (1990), 49 Ohio St.3d 247, 249.
If a defendant fails to meet the burden of production, the jury should not be instructed on self-defense. In State v. Rogers
(1975), 43 Ohio St.2d 28, the Ohio Supreme Court rejected the defendant's claim that an instruction was required because "the record [was] devoid of evidence that [defendant], out of concern for his safety, intended to shoot the decedent . . . or that the decedent committed an overt act by which [defendant], could reasonably, and in good faith, believe that he was in imminent danger of death or great bodily harm."
The test for determining when a jury instruction is required is "whether the defendant introduced sufficient evidence, which, if believed, would raise a question in the minds of reasonable men concerning the existence of such issues." State v. Robbins, supra
at 80.
The State argues that the trial court properly denied the requested instruction, because the defendant was at fault in creating the situation giving rise to the use of force, because his own testimony was inconsistent with fear of the victim, and because he denied assaulting the victim with the bike chain.
After careful review of the evidence, we agree with the State that the trial court properly rejected the defendant's request for the self-defense instruction. We disagree that the State's evidence raised a viable issue of self-defense. The third assignment of error is overruled.
In appellant's fourth assignment, he contends the judgment was against the manifest weight of the evidence and was violative of his due process rights because it was based on insufficient evidence.
Appellant contends that his conviction should be reversed because Mr. Dickson and other State's witnesses contradicted themselves on a number of occasions during their testimony. The appellant states the back injury suffered by Mr. Dickson may have been self-inflicted during the two hours prior to his medical examination.
The due process clause of the United States Constitution requires that every element of a crime be proven beyond a reasonable doubt in order to support a conviction. In re Winship
(1970), 367 U.S. 358, 90 S.Ct. 1068; Taylor v. Kentucky (1978),436 U.S. 478, 98 S.Ct. 1930. The Ohio Supreme Court requires reversal if "reasonable minds cannot reach the conclusion reached by the trier of facts." State v. Jenks (1991), 61 Ohio St.3d 259,273. The evidence must be viewed in a sufficiency challenge in a light most favorable to the prosecution. We agree with the State that the judgment was not based on insufficient evidence as a matter of law.
We also have weighed the evidence and found that the judgment is not against the manifest weight of the evidence. There is no evidence the jury lost its way in resolving the evidentiary conflicts and created a manifest miscarriage of justice. State v.Thompkins (1997), 78 Ohio St.3d 380, 386. The fourth assignment of error is likewise overruled.
In his fifth assignment, Staton contends the trial court engaged in vindicative conduct in imposing a harsher sentence upon him after his retrial.
The sentence imposed by the trial court after the retrial provided for a fine of $1,000, with $500 suspended (the original fine was $500); a 180 day suspended jail sentence (the original sentence was 60 days suspended); two years probation (no probation was originally required); and 120 hours of community service (originally, 15 days of in-house arrest was imposed).
The United States Supreme Court in North Carolina v. Pearce
(1969), 395 U.S. 711, 723-24, 89 S.Ct. 2072, held that it was a violation of the Due Process Clause of the Fourteenth Amendment when the trial court judge, motivated by vindictive retaliation caused by a defendant's successful appeal, resentenced the defendant to a more severe sentence. The Supreme Court has addressed situations more closely related to appellant's situation where he was retried by a completely different judge and court in the second trial pursuant to a "de novo" appeal. In Colten v.Kentucky (1972), 407 U.S. 104, 92 S.Ct. 1953, a criminal defendant challenged the constitutionality of an enhanced penalty which he received under Kentucky's two tiered system of justice. The Court concluded that "the possibility of vindictiveness, found to exist in Pearce, is not inherent in the Kentucky two-tier system," and thus the rule announced in Pearce was inapplicable. Id. at 116, 92 S.Ct. At 1959.
 We note first the obvious: that the court which conducted Colten's trial and imposed the final sentence was not the court with whose work Colten was sufficiently dissatisfied to seek a different result on appeal; and it is not the court that is asked to do over what it thought it had already done correctly.
407 U.S. 104 at 116, 117.
Justice Marshall dissented in Colten and made the following observation:
 The Court suggests that for some reason there is less danger of vindictive sentencing on the second trial in this context than after an ordinary appeal. Specifically, the Court faults the appellant for failing to present evidence that the danger of vindictiveness is as great here as in the precise context presented in Pearce. But Pearce did not rest on evidence that most trial judges are hostile to defendants who obtain a new trial after appeal. Pearce was based, rather, on the recognition that whenever a defendant is tried twice for the same offense, there is inherent in the situation the danger of vindictive sentencing the second time around, and that this danger will deter some defendants from seeking a second trial. This danger, with its deterrent effect, is exactly the same even though the second trial takes place in a different court from the first. Certainly a defendant has good reason to fear that his case will not be well received by a second court after he rejects a disposition as favorable as the sentence originally imposed in this case. Pearce was directed toward a new trial after an appellate reversal. This case involves a new trial without an appellate reversal. The core problem is the second trial. In both cases we have a second full and complete trial. Pearce should control. (Emphasis ours).
In Wasman v. United States (1984), 468 U.S. 559, the U.S. Supreme Court noted that the trial judge carefully explained the reasons for imposing the greater sentence, and his consideration of the defendant's intervening conviction was manifestly legitimate, amply rebutting any presumption of vindictiveness.
Justice Powell concurred in part and wrote separately at page 574 of the Court's opinion:
 The Pearce presumption is not simply concerned with actual vindictiveness, but also was intended to protect against reasonable apprehension of vindictiveness that could deter a defendant from appealing a first conviction. 395 U.S., at 725. Both of these concerns are fully met in this case. It would be difficult to think of an event or occurrence more relevant to the determination of a proper sentence than a criminal conviction obtained in the interim between an original sentencing and a sentencing following retrial.
 Justice Brennan and Marshall concurred in the judgment for the reasons expressed in Justice Powell's concurring opinion.
Justice Stevens also concurred in the judgment and stated:
 The reason I am unable to join the opinion that THE CHIEF JUSTICE has authored is that it interprets North Carolina v. Pearce, 395 U.S. 711 (1969), as resting entirely on a concern with the actual vindictiveness of the sentencing judge and does not identify the interest in protecting the defendant against the reasonable apprehension of vindictiveness that might deter him from prosecuting a meritorious appeal. See id., at 724-725. "The rationale of our judgment in the Pearce case, however, was not grounded upon the proposition that actual retaliatory motivation must inevitably exist. Rather, we emphasized that `since the fear of such vindictiveness may unconstitutionally deter a defendant's exercise of the right to appeal or collaterally attack the first conviction, due process also requires that a defendant be freed of apprehension of such a retaliatory motivation on the part of the sentencing judge." Blackledge v. Perry, 417 U.S. 21, 28 (1974) (quoting Pearce, 395 U.S., at 725). What I believe to be the correct reading of Pearce is set forth in Judge Markey's able opinion for the Court of Appeals. See 700 F.2d 663 (CA 11 1983). (Emphasis ours).
Accordingly, we understand the holding of Wasman to be that where a judge imposes a more severe sentence upon the defendant after a new trial, the reasons for his doing so must affirmatively appear upon the record. Those reasons must be based upon objective information concerning identifiable conduct on the part of the defendant occurring after the time of the original sentencing. North Carolina v. Pearce, supra, at 726. The trial court failed to explain why it imposed a more severe sentence after the defendant's second trial. The fifth assignment is sustained.
In appellant's sixth assignment he contends the trial court erred in overruling his motion to dismiss on speedy trial grounds. Staton contends the delay of over two hundred days between this court's reversal of his conviction and his new trial violated his rights to a speedy trial as guaranteed by the Sixth Amendment of the U.S. Constitution.
This Court entered its judgment on December 22, 1997, and the Ohio Supreme Court denied Staton's leave to appeal on April 22, 1998 and notified this court of its decision on May 11, 1998. On July 16, 1998 the matter was set for trial on August 6, 1998. On July 21, 1998 Staton requested the trial be continued until August 13, 1998.
In determining whether there is constitutional violation, the court should consider four factors: length of the delay, reason for the delay, assertion of right by defendant, and any resulting prejudice. Barker v. Wingo (1972), 407 U.S. 514, 530.
The delay in this case was from May 11, 1998 until August 13, 1998. The defendant not only did not assert his speedy trial rights were being violated when the August 6, 1998 trial date was set by the trial court, he requested that it be continued until August 13, 1998.
The defendant was not incarcerated during the pre-trial period. He does not assert that any witnesses were unavailable because of the delay between the first and second trial. The trial court did not err in overruling the defendant's motion to dismiss on speedy trial grounds. The sixth assignment is overruled.
The judgment of the trial court is Reversed, and this cause is Remanded for further proceedings consistent with this opinion.
FAIN, J., concurs.
WOLFF, J., concurs in part and dissents in part with opinion.