DECISION AND JUDGMENT ENTRY
{¶ 1} Defendant-appellant, Krista Harris, appeals the June 29, 2004 judgment entry of the Erie County Court of Common Pleas which, following a reversal by this court[1] and a conviction following a second jury trial, sentenced appellant to three-year prison terms for four counts of theft of an elderly person, in violation of R.C. 2913.02(A)(2), third degree felonies; one-year prison terms for three counts of theft of a elderly person, in violation of R.C. 2913.02(A)(2), fourth degree felonies; and a five-year prison term for one count of theft of an elderly person, in violation of R.C. 2912.02(A)(2), a second degree felony. The sentences were ordered to be served concurrently. For the reasons that follow, the trial court's judgment is affirmed, in part, and reversed, in part.
 {¶ 2} The relevant facts of this case are as follows. On August 16, 2000, appellant was given a general durable power of attorney by her great-great aunt Mary Bell Taylor, then 79 years old. Taylor, a resident of Trenton, New Jersey, had temporarily come to live with appellant due to health concerns. It is undisputed that appellant removed all of Taylor's funds from her accounts at two Trenton, New Jersey banks and that the majority of the funds ended up in appellant's personal account at Citizens Bank in Sandusky, Erie County, Ohio. Appellant claimed that the money was a gift to her; the state contended that it was theft.
 {¶ 3} On March 12, 2001, appellant was indicted on multiple counts of theft; the indictment was amended on April 11, 2002, the date of appellant's original trial. On April 19, 2002, appellant was convicted of 11 of the 12 counts. On May 22, 2002, appellant was sentenced to a total of five years of incarceration; she immediately began serving the sentence.
 {¶ 4} On May 20, 2004, following this court's September 30, 2003 reversal of her conviction, appellant's case was again tried before a jury. The state presented the testimony of Taylor, several bank employees from Ohio and from New Jersey, Taylor's treating physician, hospital nurses, a medical social worker, investigating officers, and Taylor's attorney. Two attorneys that appellant contacted regarding the case and appellant's father testified on her behalf.
 {¶ 5} The evidence relevant to the issues presented on appeal is as follows. The alleged victim, Mary Bell Taylor, testified that at the time of trial she was 83 years old. Taylor had lived in Trenton, New Jersey since 1944, and her husband died in 1962. The Taylors did not have any children. Taylor stated that she first met appellant, her great-great niece, in 1999 at a family funeral. Prior to that date, Taylor had never sent appellant a card or gift for her birthday or for a special occasion.
 {¶ 6} In 2000, Taylor moved to Sandusky, Ohio, to live with her great niece, appellant's mother, Betty Harris. Taylor testified that the move was only temporary; her doctor recommended that, following a "light stroke," she live with assistance for approximately six months. Taylor testified that she went to live with appellant when Betty Harris threw her out of her home.
 {¶ 7} During her stay in Ohio, Taylor was hospitalized three times. In August 2000, appellant came to the hospital and had Taylor sign a document granting appellant a general power of attorney. Taylor testified that she was asleep when appellant arrived, they woke her and she signed the document. Taylor noted that she had never requested that appellant be given a power of attorney and, in any event, she had never given appellant permission to take money out of her bank accounts and transfer it to appellant's personal bank account. At the time they occurred, Taylor had no knowledge of the bank transfers.
 {¶ 8} In September, Taylor was again hospitalized. Taylor testified that she told the nurses that she did not want to go back to appellant's house because appellant did not treat her well and that she believed that appellant was taking money from her. Taylor stated that she had a nurse call another great-great niece, Lisa Harris, who stated that she could live in a house she owned. Lisa's brother, Don Martin, picked Taylor up from the hospital and they drove over to appellant's house to retrieve her personal effects. According to Taylor, appellant refused to give her her belongings, which included her clothing, purse, house keys, and medication.
 {¶ 9} Taylor testified that she met with an attorney, revoked appellant's power of attorney, and executed a new power of attorney. On the same day, a New Jersey police officer telephoned Taylor and asked if she had given appellant permission to move her furniture and belongings out of her home. Taylor asked the officer to "please stop her;" she was planning on returning to New Jersey. Taylor testified that she did not tell appellant that she wished to give her all of her money; she told her that if appellant cared for her she would leave her something upon death.
 {¶ 10} During cross-examination, Taylor was confused and did not understand some of the questions; however, she was insistent that she did not give appellant all of her money. Taylor was questioned regarding the fact that she was declared incompetent in Ohio for a time. She stated that she was sick and could not take care of her affairs. Taylor testified that although she now has a guardian in New Jersey, she is able to take care of herself and pay her own bills.
 {¶ 11} Following Taylor's testimony, several Ohio and New Jersey bank employees testified regarding the series of transactions that resulted in appellant's criminal charges. We will briefly summarize their testimony as appellant does not dispute that the transactions occurred. In Trenton, New Jersey, at Sovereign Bank, Taylor had a money market savings account, with a value of approximately $14,800, and a certificate of deposit or "CD," valued at $15,000. On June 26, 2000, appellant came to the bank with Taylor and had Lisa Harris' name removed from the account. At that time, while Taylor was out of earshot, appellant inquired about a power of attorney. On August 29, 2000, after being given a power of attorney, appellant wired $14,800 from Sovereign Bank to her account at Citizens Bank in Sandusky, Ohio. According to the Sovereign Bank representative, appellant told the teller that Taylor was ill and needed the money. On September 20, 2000, appellant, in person, withdrew $500. On September 18, 2000, appellant wired an additional $14,000 from Sovereign Bank into her Citizen's account. During this period appellant withdrew $21,680 from her Citizen's account.
 {¶ 12} Taylor also had an account at First Union National Bank in Trenton, New Jersey, with approximately $9,000 is savings and a $50,000 certificate of deposit. On September 20, 2000, appellant, in person, closed Taylor's accounts. Appellant stated that she was closing the accounts because her aunt was living with her in Ohio and appellant came to get her funds. The bank wrote her a check for $57,460.08, the total value of the accounts minus approximately $1,500 in early withdrawal penalties. On September 21, 2000, appellant opened a Key Bank account in Sandusky, Ohio, in Taylor's name, and deposited the check. On September 25, 2000, she wired $40,000 of the funds into her personal Citizen's account stating that it was for an "investment." On October 6, 2000, appellant withdrew $9,000 from her account. After receiving the funds, but prior to her leaving the bank, the teller discovered that the account had been frozen; appellant refused to return the funds. On October 7, 2000, appellant again attempted to withdraw funds but was refused.
 {¶ 13} Regarding Taylor's mental health, her treating physician, Dr. Susan Gallagher, testified that she first saw Taylor on July 27, 2000. Dr. Gallagher testified that a no time in July or August 2000, did she believe that Taylor was incompetent. In September 2000, Taylor was again evaluated for competency. Dr. Gallagher had Dr. Chandron, a neurologist, perform the evaluation. Dr. Chandron concluded that Taylor was "borderline normal cognitive function" and that "she was competent enough to make her own decisions at th[at] time." Dr. Gallagher indicated that Taylor did not exhibit the symptoms of dementia, that depression may present as dementia, and that an individual does not recover from dementia. Dr. Gallagher further testified that Taylor expressed to her that she did not wish to return to appellant's home.
 {¶ 14} During cross-examination, Dr. Gallagher was questioned regarding a November 2000 evaluation of Taylor conducted by Dr. Ibrahim where his report described Taylor as a "79 year old black female with dementia." The report was filed with the probate court and apparently a basis for her being found incompetent and appointed a guardian. Dr. Gallagher stated that she disagreed with the diagnosis.
 {¶ 15} Testimony of two of Taylor's treating nurses was presented to show her intention to become healthy and move back to New Jersey. Donna Furrer, a medical social worker, testified that she was asked by Dr. Gallagher to meet with Taylor due to some concerns the doctor had with Taylor's living situation. According to Furrer, at their September 8, 2000 meeting, Taylor stated that she felt that she was being used for her money and that appellant had not been taking good care of her.
 {¶ 16} William H. Smith, Jr., Taylor's attorney, testified that on September 26, 2000, following a family telephone call and an Adult Protective Services referral, he met with Taylor, Lisa Harris, an Adult Protective Services representative, and Sandusky Police officer Roy Prewitt. The meeting stemmed from concerns that appellant had taken money from Taylor's account and had not returned her personal effects. On that date Taylor executed a notice of revocation of power of attorney, which was prepared by Smith. Smith testified that after a 15 to 20 minute discussion with Taylor, which included her background and financial affairs, he believed her to be competent.
 {¶ 17} Smith testified that shortly thereafter, Taylor voluntarily agreed to have a conservator appointed by the Erie County Probate Count in order to protect her assets. Taylor was later appointed a guardian; the guardianship was subsequently revoked.
 {¶ 18} During cross-examination, Smith acknowledged that on November 3, 2000, he had filed a civil lawsuit on behalf of Taylor seeking the recovery of her funds. Smith indicated that he initially believed the matter to be civil, not criminal. Finally, Smith testified that the motion to dismiss the guardianship was made because Taylor was returning to New Jersey and that an application for guardianship had been filed there.
 {¶ 19} During appellant's case, attorney Tygh Tone testified that he had an initial meeting with appellant but that he was never retained as her attorney. Tone did not have any specific knowledge of the case. Geoff Oglesby, an indefinitely suspended attorney, testified next. Oglesby testified that prior to his suspension he was retained by appellant and intensely researched "whether or not she had crossed any lines as power of attorney." Oglesby indicated that there was case law that said that a power of attorney could make a gift to his or her self, but the giftee had the burden of demonstrating that the gift was authorized.
 {¶ 20} During cross-examination, Oglesby was questioned regarding the circumstances behind his indefinite suspension. Oglesby was also questioned regarding his interpretation of the relevant case law and he agreed that the holding of a particular case stated that "a general power or attorney does not give a fiduciary the ability to make gifts." There was a discussion as to whether the case stated that the power of attorney must explicitly convey such power.
 {¶ 21} Joe Harris, appellant's father, was the final witness to testify. Harris testified that Taylor told him that she wanted appellant to have her money because she did not want the rest of the family to have any of it. Harris acknowledged that there was a lot of hostility between the family members. Harris testified that at one point Taylor offered money to him and he refused. According to Harris, Taylor stated that if neither he nor appellant took the money, she would give it away before giving it to any other family members. Harris testified that Taylor never indicated that she wished to return to New Jersey; she only specified that she wished to be buried there next to her husband.
 {¶ 22} On May 28, 2004, the jury returned guilty verdicts on all counts charged. Appellant was sentenced on June 28, 2004, and this appeal followed. Appellant now raises the following five assignments of error:
 {¶ 23} "I. The sentencing of the Defendant, in her second trial, exceeded, in part, the sentence imposed in the first trial and was, therefore, unlawful.
 {¶ 24} "II. The conviction of the defendant was against the manifest weight of the evidence.
 {¶ 25} "III. The sentencing statutes of the State of Ohio, and the sentences imposed on the defendant, violate decisions of the United States Supreme Court.
 {¶ 26} "IV. Ineffective assistance of counsel.
 {¶ 27} "V. The trial court erred when it imposed a sentence in excess of the minimum authorized without the necessary findings pursuant to Section 2929.14(B)(1) and (2)."
 {¶ 28} In her first assignment of error, appellant contends that because the sentence in her second trial "exceeded," in part, the sentence in the first trial it is contrary to law. Specifically, appellant argues that for the only second-degree felony of which she was convicted she received a harsher sentence following the second trial; appellant received a five-year sentence versus the four-year sentence after the original trial. In support, appellant cites North Carolina v. Pearce (1969),395 U.S. 711, 89 S.Ct. 2072, 23 L.Ed.2d 656. The state distinguishes Pearce and, alternatively, argues that because the aggregate sentence was identical to that following the first trial, no violation occurred.
 {¶ 29} In Pearce, the United States Supreme Court held that whenever a judge imposes a more severe sentence upon a defendant after a new trial, in order to rebut a presumption of vindictiveness the reasons for the increased sentence must be affirmatively set forth and based upon some identifiable conduct of the defendant following the original sentencing. Id. at 726. However, in Texas v. McCullough (1986), 475 U.S. 134,106 S.Ct. 976, 89 L.Ed.2d 104, the court clarified the Pearce holding stating: "The presumption [of vindictiveness] is also inapplicable because different sentencers assessed the varying sentences that [the defendant] received. In such circumstances, a sentence `increase' cannot truly be said to have taken place." Id. at 140. The court, quoting Colten v. Kentucky (1972),407 U.S. 104, 117, 92 S.Ct. 1953, 1960, 32 L.Ed.2d 584, stated: "`It may often be that the [second sentencer] will impose a punishment more severe than that received from the [first]. But it no more follows that such a sentence is a vindictive penalty for seeking a [new] trial than that the [first sentencer] imposed a lenient penalty.'" Id.
 {¶ 30} In this case, the original trial and sentencing judge differs from the subsequent trial and sentencing judge. Thus, no presumption of vindictiveness exists; further, appellant has failed to demonstrate any actual vindictiveness.
 {¶ 31} The state alternatively argues that under the "sentencing package doctrine" the court can reevaluate the entire sentence by looking at the "bottom line" or the total number of years rather than a count-by-count analysis. In support of this argument the state cites to State v. Couturier (Sept. 13, 2001), 10th Dist. No. 00AP-1293. In Couturier, the court explained that the:
 {¶ 32} "sentencing package doctrine provides that, when a defendant is sentenced under a multi-count indictment and the sentences imposed on those counts are interdependent, the trial court has the authority to reevaluate the entire aggregate sentence * * * on remand from a decision vacating one or more of the original counts."
 {¶ 33} Additionally, the Pearce, supra, presumption of vindictiveness is not triggered where the "aggregate length of the new sentence does not exceed the total length of the original sentence." Couturier, citing United States v. Townsend
(1999), 178 F.3d 558, 570.
 {¶ 34} Upon review of appellant's original May 22, 2002 sentencing and the June 29, 2004 sentencing, we note that although appellant originally received a four-year prison sentence for the second degree felony and later received a five-year prison term for the same offense, the aggregate term of imprisonment, five years, remained unchanged. Accordingly, we find that the sentence imposed following appellant's second trial was lawful. Appellant's first assignment of error is not well-taken.
 {¶ 35} In appellant's second assignment of error she argues that her conviction was against the manifest weight of the evidence. Essentially, appellant argues that Taylor, the victim, was not competent to testify and that the state failed to prove that appellant possessed the culpable mental state for theft.
 {¶ 36} We first note that the "weight of the evidence" refers to the jury's resolution of conflicting testimony. State v.Thompkins, 78 Ohio St.3d 380, 387, 1997-Ohio-52. In determining whether a verdict is against the manifest weight of the evidence, the appellate court sits as the "thirteenth juror" and "* * * weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." Id.
 {¶ 37} Appellant first contends that "the state never prove[d] the legal competency of Taylor at the time of trial." Initially, we note that the state did not have the burden of proving Taylor's competency and appellant's counsel never requested a competency hearing. Evid.R. 601(A) provides:
 {¶ 38} "Every person is competent to be a witness except:
 {¶ 39} "(A) Those of unsound mind, and children under ten years of age, who appear incapable of receiving just impressions of the facts and transactions respecting which they are examined, or of relating them truly."
 {¶ 40} In order to be a competent witness, an individual must be able to correctly state matters within her perception, with respect to the issues involved, and appreciate and understand the nature and obligation of an oath. State v. Wildman (1945),145 Ohio St. 379, paragraph three of the syllabus. Although a witness has been judicially declared incompetent, it does not necessarily follow that the person is of "unsound mind" as provided in Evid.R. 601(A). State v. Bradley (1989), 42 Ohio St.3d 137,140.
 {¶ 41} Looking at Taylor's mental state, although suggested, it was never conclusively shown that she had a guardian at the time of trial. Regardless, Taylor's testimony did not evidence that she, in any way, was of unsound mind. In fact, she was, as defense counsel observed, very "spirited" and unwavering in her conviction that she never authorized appellant to take her funds. Taylor was a little confused during defense counsel's cross-examination. However, the confusion was not pervasive and could easily be attributed to nerves, her age, and difficulty hearing the soft-spoken defense counsel;[2] it did not affect the substance of her testimony.
 {¶ 42} Finally, as stated in Bradley, supra, the credibility of Taylor's testimony was an issue to be resolved by the jurors. After carefully reviewing Taylor's testimony, we cannot say that the jury "lost its way" or created a miscarriage of justice in any conclusions it reached regarding her credibility.
 {¶ 43} Appellant next argues that her convictions were against the manifest weight of the evidence in that the state failed to prove that appellant has the requisite mental state for theft. What appellant is essentially arguing is that the state's evidence of intent was insufficient. In determining whether a verdict is supported by sufficient evidence "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." State v. Jenks (1991), 61 Ohio St.3d 259, paragraph two of the syllabus.
 {¶ 44} R.C. 2913.02 provides, in relevant part, that:
 {¶ 45} "(A) No person, with purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 {¶ 46} "* * *;
 {¶ 47} "(2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent; * * *."
 {¶ 48} R.C. 2901.22(A) defines "purposely" as acting with specific intent to cause a certain result. Intent lies within the privacy of an individual's own thoughts and is not susceptible of objective proof. State v. Garner, 74 Ohio St.3d 49, 60, 1995-Ohio-168. The law recognizes that intent can be proven from the surrounding facts and circumstances and that "persons are presumed to have intended the natural, reasonable and probable consequences of their voluntary acts." (Citations omitted.) Id.
 {¶ 49} Upon review of the trial transcript, we must find that appellant's conviction for multiple-theft related crimes is supported by ample evidence of intent. Appellant's basic defense was that Taylor gifted the money to her. However, there was testimony presented that appellant told New Jersey bank officials that Taylor was ill and needed the money and that appellant was taking Taylor's money back to Sandusky, Ohio, on her behalf. Further, there was testimony that Taylor never inquired about granting appellant a power of attorney; rather, when Taylor was otherwise occupied at the bank, appellant questioned a bank official about one for Taylor. Taylor testified that she never gave appellant permission to take the money; her health care providers testified regarding Taylor's concerns about appellant using her for her money. Finally, their was testimony presented regarding the fact that after Taylor was released from the hospital, appellant refused to return any of her personal belongings, including her purse and medication.
 {¶ 50} Based on the foregoing, we find that appellant's convictions were supported by sufficient evidence and were not against the weight of the evidence. Appellant's second assignment of error is not well-taken.
 {¶ 51} In appellant's third assignment of error, she contends that the trial court's sentence violates the recent decisions of the United States Supreme Court regarding the enhancement of sentences pursuant to findings made by the court, rather than a jury. Upon review, we find that this case is controlled by the Supreme Court of Ohio's decision in State v. Foster, ___ Ohio St.3d ___, 2006-Ohio-856. In Foster, the court held that R.C.2929.14(B) violates the Sixth Amendment to the United States Constitution, pursuant to Blakely v. Washington (2004),542 U.S. 296, and Apprendi v. New Jersey (2000), 530 U.S. 466. Because the trial court relied on an unconstitutional statute when sentencing appellant, we find that the sentence is void and must be vacated.[3] Foster at ¶ 103-104. Accordingly, appellant's third assignment of error is found well-taken.
 {¶ 52} In appellant's fourth assignment of error, she contends that her trial counsel was ineffective in failing to establish Taylor's incompetency. Specifically, appellant argues that her trial counsel was ineffective by failing to admit into evidence Dr. Ibrahim's report finding that Taylor suffered from dementia, failing to call Dr. Ibrahim as a witness, and failing to call the probate officer as a witness.
 {¶ 53} The standard for determining whether a trial attorney was ineffective requires appellant to show: (1) that the trial attorney made errors so egregious that the trial attorney was not functioning as the "counsel" guaranteed appellant under theSixth Amendment, and (2) that the deficient performance prejudiced appellant's defense. Strickland v. Washington (1984),466 U.S. 668, 686-687, 104 S.Ct. 2052, 80 L.Ed.2d 674. In essence, appellant must show that her trial, due to her attorney's ineffectiveness, was so demonstrably unfair that there is a reasonable probability that the result would have been different absent her attorney's deficient performance. Id. at 693.
Furthermore, a court must be "highly deferential" and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance" in reviewing a claim of ineffective assistance of counsel. Id. at 689. A properly licensed attorney in Ohio is presumed to execute his or her duties in an ethical and competent manner. State v. Hamblin
(1988), 37 Ohio St.3d 153, 155-56. Debatable strategic and tactical decisions may not form the basis of a claim for ineffective assistance of counsel. State v. Phillips,74 Ohio St.3d 72, 85, 1995-Ohio-171. Even if the wisdom of an approach is debatable, "debatable trial tactics" do not constitute ineffective assistance of counsel. Id. Finally, reviewing courts must not use hindsight to second-guess trial strategy, and must bear in mind that different trial counsel will often defend the same case in different manners. Strickland, supra at 689;State v. Keenan, 81 Ohio St.3d 133, 152, 1998-Ohio-459.
 {¶ 54} Appellant claims that admission of Dr. Ibrahim's report and testimony regarding his dementia diagnosis was crucial to the establishment "at a critical point in time" of the incompetency of Taylor, the state's "chief witness." We first note that the power of attorney was signed on August 16, 2000, and appellant's final attempted withdrawal from her Citizen's account occurred on October 7, 2000. Thus, all the pertinent events transpired prior to the November evaluation. Certainly, we are not suggesting that an evaluation completed a few months after the events at issue is not relevant; however, it does not conclusively establish, as claimed by appellant, that Taylor was incompetent either during the events at issue or at the time of the second trial. Additionally, defense counsel cross-examined Taylor's treating physician, at length, regarding Dr. Ibrahim's report.
 {¶ 55} Based on the foregoing, we find that the jury was made well aware of Dr. Ibrahim's evaluation which diagnosed Taylor with dementia. Even assuming that defense counsel should have admitted the report into evidence and/or presented the testimony of Dr. Ibrahim, we cannot say that had the evidence been presented the outcome of the trial would have been different. Taylor's testimony that she had not gifted the money to appellant was clear, coherent, and unwavering. Further, after reading the entire, lengthy trial transcript we must conclude that appellant's trial counsel performed laudably despite little cooperation from her client. Appellant's fourth assignment of error is not well-taken.
 {¶ 56} In appellant's fifth and final assignment of error, she contends that the trial court failed to make the necessary findings pursuant to R.C. 2929.14(B). Based on our disposition of appellant's third assignment of error, and the Ohio Supreme Court's holding in State v. Foster, ___ Ohio St.3d ___,2006-Ohio-856, we find the assignment of error moot and not well-taken.
 {¶ 57} On consideration whereof, we find that appellant was not prejudiced or prevented from having a fair trial, and appellant's conviction for nine counts of theft, one count of receiving stolen property, and one count of attempted theft is affirmed. The trial court's June 29, 2004 judgment sentencing appellant to a total prison term of five years is vacated and the matter is remanded to the trial court for resentencing pursuant to Foster. Appellee is ordered to pay the costs of this appeal pursuant to App.R. 24. Judgment for the clerk's expense incurred in preparation of the record, fees allowed by law, and the fee for filing the appeal is awarded to Erie County.
JUDGMENT AFFIRMED, IN PART AND REVERSED, IN PART
A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. See, also, 6th Dist.Loc.App.R. 4, amended 1/1/98.
Handwork, J., Pietrykowski, J., Skow, J. concur.
[1] On September 30, 2003, this court reversed appellant's conviction and remanded the matter for a new trial based upon our finding that appellant's waiver of her right to counsel was not made knowingly and voluntarily. State v. Harris, 6th Dist. No. E-02-019, 2003-Ohio-5190.
[2] During the trial, defense counsel was repeatedly asked to speak up and into the microphone.
[3] We note that although, prior to Foster, appellant's Fifth Assignment of Error, infra, likely had merit, the Ohio Supreme Court's decision effectively overruled State v. Comer,99 Ohio St.3d 463, 2003-Ohio-4165; thus, because R.C. 2929.14(B) was referenced in the judgment entry, the trial court, in sentencing appellant, relied on an unconstitutional statute and the sentence must be vacated.