OPINION *Page 2 
{¶ 1} Defendant-Appellant, Joseph E. Davis, appeals the judgment of the Marion County Court of Common Pleas, convicting him of theft and falsification. On appeal, Davis argues that the jury's verdict was against the manifest weight of the evidence. Finding that the evidence supports his convictions, we affirm the judgment of the trial court.
 {¶ 2} In February 2006, the Marion County Grand Jury indicted Davis for one count of theft in violation of R.C. 2913.02(A)(2), a felony of the fourth degree, and one count of falsification in violation of R.C.2921.13(A)(3), a misdemeanor of the first degree.
 {¶ 3} In March 2006, Davis entered a plea of not guilty to both counts in the indictment.
 {¶ 4} In August 2006, the case proceeded to a jury trial, during which the following testimony was heard concerning the theft count.
 {¶ 5} Johnny Page, a friend of Davis, testified that, in December 2003, he anticipated being incarcerated for several years for kidnapping, attempted sexual battery, domestic violence, and furnishing alcohol to a minor; that he was expecting a retirement check from the Ohio Public Employees Retirement System (hereinafter referred to as "OPERS") in the amount of $62,094.90; that he made an agreement concerning the check with Davis; that when he made the agreement with Davis he intended to reimburse his *Page 3 
sisters and his cousin for money that he had borrowed from them; that he anticipated incurring legal expenses and hiring an attorney to assist him with his impending divorce proceedings and, eventually, with judicial release; and, that he and Davis agreed that "[Page] would have [Davis] cash [his] check and pay these people the bills and also hire [Page] an attorney for * * * Judicial Release, and also, * * * divorce [his] wife." (Trial Tr. p. 141-142).
 {¶ 6} Further, Page testified that he arranged to have the check sent to Davis' residence to deposit in Page's bank account; that he informed Davis of the amounts that Davis should pay to his sisters and cousin from the check; that he at no time agreed that Davis should keep the money for himself or that the money was a gift; that he did not give Davis power of attorney; that he did not agree that Davis should buy him a house; that he has not received a deed to a house from Davis; and, that Davis spent the entire check on Davis' own personal expenses and that none was spent for his or his family's benefit.
 {¶ 7} Captain Nicholas Todd Heil of the Upper Sandusky Police Department testified that Page's sister, Rose Page, reported the check as stolen to the police in September 2005.
 {¶ 8} Lieutenant Eric Parks of the Upper Sandusky police department testified that he contacted Davis during the investigation of the alleged theft; that Davis told him that Page had given Davis a power of attorney and that the account was empty because *Page 4 
the IRS had seized Page's money; that his investigation of the bank account showed that no IRS garnishment or seizure of the money had taken place; and, that he arranged for an appointment with Davis to examine the alleged power of attorney document, but that Davis did not come or produce the document.
 {¶ 9} Ron Boose, the assistant vice president and security officer of the First Citizens National Bank in Upper Sandusky, testified that Davis maintained an account at the bank; that Davis deposited a check for $62,094.90 into his account on March 17, 2004, which was endorsed "Johnny Page, Joseph Davis, POA" (trial tr. p. 120, 122); that, on April 7, 2004, the account was overdrawn; that the bank had no power of attorney documents on file from Page; that there were no federal liens or garnishments against the account; that no checks were written from the account to Brenda Fissell (Page's sister), Robert Chafin (Page's cousin), or to the Marion County Clerk of Courts; and, that within twenty-two days after the deposit of the check, the account was depleted.
 {¶ 10} Fissell testified that she had lent money to Page; that Page had informed her that Davis would be receiving the retirement check and would reimburse her for her loan; that she confronted Davis about the check and he told her it was being held up by Page's ex-wife for child support; and, that she received no payment from Davis.
 {¶ 11} Chafin testified that he had also lent money to Page; that Page promised to reimburse him with funds from his retirement check; that he confronted Davis about the *Page 5 
check and Davis told him that there was a holder on the check from Page's divorce; and, that he received no payment from Davis.
 {¶ 12} Julie Kagel, the Marion County Clerk of Court for the Common Pleas Court, testified that the court had not put any holder on distributed OPERS monies pursuant to Page's divorce or child support cases.
 {¶ 13} Davis testified that "the terms of the agreement was (sic.) that I was supposed to use the money as I saw fit until [Page] got out of prison. If I found a house that would benefit [Page], then to go ahead and purchase that house. [I]f one came up go ahead and get it. Just things along those lines." (Trial Tr. p. 339). Davis further testified that he did not think that Page's money belonged to him; that he intended to reimburse Page; that he and Page had entered into a power of attorney, but that he had lost it; that he currently has no assets; that he never paid any money to Chafin, Fissell, or for Page's court costs, fees, or attorneys; that all of the money was used for his own expenses and not for Page's; and, that he had entered into an agreement to purchase a house from Daniel Burns, his girlfriend's father, for Page, but had no documentation of the agreement.
 {¶ 14} Davis' brother, John Octaviano, testified that he was present when Page and Davis made the agreement concerning the check; that he, Davis, and Page were all involved in the conversation; that the conversation took place outside in a barn; and, "that [Davis] was to use the money as he seen (sic.) fit to take care of [Page's] girlfriend that *Page 6 
was living out there with [Davis] and his family * * * and that as long as [Davis] had a place to stay and a job [for Page] when he got out [Davis] could just do with it as he seen (sic.) fit." (Trial Tr. p. 305).
 {¶ 15} Tamara Metzger, Page's girlfriend's estranged sister, testified that she was present at the time Page and Davis made the agreement; that six people were present when the conversation took place; that the conversation took place inside Davis' house; and, that Octaviano was outside of the house. She testified that "[Page] was dating my sister at the time. And she was gonna stay with [Davis] and [Elizabeth Burns] while [Page] was gone in prison. And [Davis] was gonna get him a house, have him a house, have him a job, and take care of my sister, and so with what he — whatever [Davis] needed, and they was (sic.) gonna square up when [Page] got out of prison." (Trial Tr. p. 313).
 {¶ 16} Elizabeth Burns, Davis' girlfriend and Page's ex-wife, testified that she also heard the agreement inside the house; that the conversation took place in several different places; and, that the agreement was that "[Page] would have a place to stay when he got out, we would take care of his girlfriend, he would have a job when he got out, he'd be taken care of when he got out." (Trial Tr. p. 320-321). Elizabeth further testified that Davis was supposed to reimburse Page when Page was released from prison.
 {¶ 17} Daniel Burns, Elizabeth Burns' father, testified that he and Davis had entered into an agreement whereby Davis would remodel Burns' home in exchange for a *Page 7 
house; that the work was begun in 2002 and completed by 2003; that there was no documentation of the agreement; and, that he had not yet transferred the house or deed to Davis.
 {¶ 18} The following testimony was heard regarding the falsification count.
 {¶ 19} Vicky Fox, of Westfield Insurance Company, testified that Davis made an insurance claim in October 2004 for a John Deere Gator, a utility vehicle, that he claimed had been stolen; that Davis gave her the serial number W006X4X029146; and, that the company paid Davis $5,813.00 for his claim.
 {¶ 20} Sergeant Lee Blair, of the Marion County Sheriffs Office, testified that in October 2004, Elizabeth Burns reported that a Gator had been stolen from Davis; that Davis gave Blair the serial number W006X4X029146 for the stolen Gator; that Davis described the Gator as having a homemade hitch, a dump bed with a liner, and a clear plastic windshield; that Blair checked the serial number W006X4X029146 and found that it was registered to a Gator belonging to Loyola College in Maryland; that, in November 2005, Blair conducted a search of Davis' home in an unrelated investigation; that during the search he discovered a Gator meeting the exact description of the Gator reported stolen by Davis; that he checked the serial number on the Gator, which was W006X4X029143 (one digit different from the number reported by Davis), and learned that it was classified as stolen from Union County in 2001; that it is more common for one digit of a number to be fabricated, instead of the entire number, when people falsify *Page 8 
identifying information; and, that Davis provided him with no proof of ownership of the Gator.
 {¶ 21} Gary Baker testified that his Gator was stolen from Union County in 2001; that the Gator had a windshield, a dump bed with a liner, a homemade hitch, and the serial number W006X4X029143.
 {¶ 22} Dennis Dumbaugh, the garden sales manager of McChesney Implement of Marion, Ohio, testified that in August 2004, Davis had a Gator serviced by McChesney Implement, which had the serial number W006X4X029143.
 {¶ 23} Elizabeth Burns testified that Davis had owned two Gators at one point.
 {¶ 24} On cross-examination, Elizabeth testified that Davis had purchased the Gator with the serial number W006X4X029143 as a replacement for the Gator stolen in October 2004.
 {¶ 25} Davis testified that he purchased the Gator with the serial number W006X4X029143 from a flea market, with cash, and received no bill of sale or receipt; that at one point he owned two Gators that were nearly identical; that the other Gator was the one reported stolen in October 2004; and, that he may have inadvertently given the wrong serial number to the police.
 {¶ 26} Subsequently, the jury convicted Davis of both the theft count and the falsification count. *Page 9 
 {¶ 27} In September 2006, the trial court sentenced Davis to an eighteen-month prison term on the theft count and to a one-hundred-eighty day term on the falsification count, to be served concurrently for an aggregate of eighteen months. Davis was also ordered to pay restitution of $62,094.90 to Page, and $5,813.00 to Westfield Insurance.
 {¶ 28} It is from this judgment that Davis appeals, presenting the following assignments of error for our review.
 Assignment of Error No. I DEFEND ANT-APPELLANT'S CONVICTION FOR THEFT IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
 Assignment of Error No. II DEFEND ANT-APPELLANT'S CONVICTION FOR FALSIFICATION IS CONTRARY TO THE MANIFEST WEIGHT OF THE EVIDENCE.
 {¶ 29} The following standard of review applies throughout.
 Standard of Review {¶ 30} When an appellate court analyzes a conviction under the manifest weight standard it must review the entire record, weigh all of the evidence and all of the reasonable inferences, consider the credibility of the witnesses and determine whether in resolving conflicts in the evidence, the fact finder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins,78 Ohio St.3d 380, 387, 1997-Ohio-52, superseded by *Page 10 
constitutional amendment on other grounds as stated by State v. Smith,80 Ohio St.3d 89, 1997-Ohio-355, quoting State v. Martin (1983),20 Ohio App.3d 172, 175. Thus, only in exceptional cases, where the evidence "weighs heavily against the conviction," should an appellate court overturn the trial court's judgment. Id.
 Assignment of Error No. I {¶ 31} In his first assignment of error, Davis argues that his theft conviction was against the manifest weight of the evidence. Specifically, Davis contends that Page gave him permission to spend Page's OPERS retirement money however he wanted. We disagree.
 {¶ 32} R.C. 2913.02(A)(2) defines theft, providing, in pertinent part:
 No person, with the purpose to deprive the owner of property or services, shall knowingly obtain or exert control over either the property or services in any of the following ways:
 * * *
 (2) Beyond the scope of the express or implied consent of the owner or person authorized to give consent.
 {¶ 33} Regarding the purpose element of theft, State v. Harris, 6th Dist No. E-04-034, 2006-Ohio-1396, explained that "R.C. 2901.22(A) defines `purposely' as acting with specific intent to cause a certain result. Intent lies within the privacy of an individual's own thoughts and is not susceptible of objective proof." Harris, 2006-Ohio-1396, at ¶ 48, citing State v. Garner, 74 Ohio St.3d 49, 1995-Ohio-168. However, "the law recognizes that intent can be proven from surrounding facts and circumstances[.] * * *Page 11 
*" Id. Accordingly, the intent to deprive an owner of his property may be shown by surrounding facts and circumstances.
 {¶ 34} Here, Davis argues that Page gave him the money with permission to do as he pleased with it while Page was incarcerated. However, a review of the record indicates that testimony also existed that Page gave Davis his retirement check for the purpose of paying Page's relatives, court costs, and attorneys; that the check was not a gift that Davis could use for his own personal expenses; that, when the police asked Davis about the money, he told them it had been garnished by the IRS, but the IRS had not done so; and, that when Page's relatives asked Davis about the money, he told them there was a holder on it from Page's divorce, but the court had not done so. Although Davis' testimony contradicts this testimony, we cannot say the jury clearly lost its way and created a manifest injustice in convicting Davis of theft, particularly given that "the jury was free to believe all, part, or none of any witnesses' testimony." State v. Antill (1964), 176 Ohio St. 61. "The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its judgment for that of the trier of fact." State v.Awan (1986), 22 Ohio St.3d 120, 123. Here, the jury chose to believe Page's version of events rather than those proposed by Davis. Thus, we find that Davis' theft conviction was not against the manifest weight of the evidence.
 {¶ 35} Accordingly, we overrule Davis' first assignment of error. *Page 12 
 Assignment of Error No. II {¶ 36} In his second assignment of error, Davis asserts that his falsification conviction was against the manifest weight of the evidence. Specifically, Davis contends that the evidence shows that he owned a Gator that was stolen and he inadvertently gave the incorrect serial number to both the police and the insurance company. We disagree.
 {¶ 37} R.C. 2921.13(A)(3) defines falsification, providing in pertinent part:
 No person shall knowingly make a false statement, or knowingly swear or affirm the truth of a statement previously made, when any of the following applies:
 * * *
 (3) The statement is made with purpose to mislead a public official in performing the public official's official function.
 {¶ 38} Regarding the element of purpose, State v. Hinson, 8th Dist. No. 87132, 2006-Ohio-3831, explained that an admission of guilt is not required to show purpose, but that "proof of guilt may be made by circumstantial evidence, real evidence, and direct or testimonial evidence, or any combination of the three, and all three have equal probative value." Hinson, 2006-Ohio-3831, at ¶ 61.
 {¶ 39} Here, Davis argues that his Gator was stolen; that he inadvertently reported the wrong serial number to the police and to the insurance company; and, that the Gator found on his property was purchased from a flea market and was not the Gator that he had reported stolen. However, other testimony was presented that Davis falsely reported to the police and his insurance company that his Gator was stolen; that he fabricated the *Page 13 
serial number given to the police and the insurance company; and, that he retained the Gator on his property and received the insurance money.
 {¶ 40} Although Davis' testimony contradicts the State's testimony, the jury was free to believe all, part, or none of any witness' testimony. Antill, 176 Ohio St. 61. Here, the jury chose to believe the version of events set forth by the State rather than Davis' testimony. Because the weight to be given the evidence and credibility of witnesses are primarily reserved for the trier of fact, State v. DeHass,10 Ohio St.2d 230, paragraph one of the syllabus, we find that Davis' falsification conviction was not against the manifest weight of the evidence.
 {¶ 41} Accordingly, we overrule Davis' second assignment of error.
 {¶ 42} Having found no error prejudicial to the appellant herein, in the particulars assigned and argued, we affirm the judgment of the trial court.
Judgment affirmed
 PRESTON and WILLAMOWSKI, JJ., concur. *Page 1